Louise K. NOLLEY, Plaintiff,

v.

COUNTY OF ERIE; Thomas Higgins, Sheriff; John Dray, Superintendent; and Jane O'Malley, Nurse, Defendants.

No. CIV–88–1170C.

United States District Court, W.D. New York.

Aug. 20, 1992.

Damon & Morey, Buffalo, N.Y. (Jennifer Coleman, of counsel), for plaintiff.

Patrick H. NeMoyer, Erie County Atty., Buffalo, N.Y. (James L. Tuppen, Asst. Erie County Atty., of counsel), for defendants.

## BACKGROUND

CURTIN, District Judge.

In this court's detailed decision of October 31, 1991, *Nolley v. County of Erie*, 776 F.Supp. 715 (W.D.N.Y.1991), the court found that four defendants violated a number of plaintiff Louise K. Nolley's statutory and constitutional rights. The defendants named were Erie County, Sheriff Thomas Higgins, Superintendent John Dray, and Nurse Jane O'Malley. *Id.* at 717. The court's findings were set forth in abbreviated form at the end of its decision, as follows:

I. *Red Sticker Policy*

 A. Defendants' Red Sticker policy violated plaintiff's privacy rights under article 27–F of New York's Public Health Law and [Commission of Correction] [("[CoC]")] regulations.

 B. Defendants' red sticker policy also violated plaintiff's constitutional right

to privacy. The policy was not reasonably related to legitimate penological interests.

II. *Segregation*

A. Defendants' policy under which plaintiff was automatically segregated in Female Delta violated plaintiff's privacy rights under article 27–F of the Public Health Law and CoC regulations.

B. This policy decision also violated plaintiff's constitutional right to privacy. The policy was not reasonably related to legitimate penological interests.

C. This policy also violated plaintiff's rights under the due process clause.

D. Defendants' segregation policy did not violate plaintiff's equal protection rights.

III. *Conditions of Confinement*

The conditions of confinement which plaintiff was subjected to in Female Delta, although deplorable, did not violate plaintiff's Eighth Amendment rights.

IV. *Law Library and Religious Services*

Plaintiff was deprived of her constitutional right of access to courts. This deprivation was based on an *ad hoc* policy implemented by Superintendent Dray and was not reasonably related to legitimate penological interests.

Plaintiff was also deprived of her First Amendment right to access congregate religious services. This deprivation was also based on an *ad hoc* policy implemented by Superintendent Dray and was not reasonably related to legitimate penological interests.

V. *Rehabilitation Act*

There was no violation of the Rehabilitation Act because ECHC did not receive "Federal financial assistance" under the Act.

*Id.* at 743. Despite these findings, the court at that time declined to award either monetary or injunctive relief as sought by the plaintiff. *Id.* at 743–44. The court will now take up those issues.

Given the court's detailed findings of fact in its prior order, *id.* at 717–25, there is no need to repeat those findings here.

## DISCUSSION

### I. INJUNCTIVE RELIEF

 Plaintiff has sought injunctive relief to eliminate the Erie County Holding Center's ("ECHC") red sticker and automatic segregation policies. This relief, however, is unnecessary at this time. The court is very pleased with the immediate response made by defendants to change the challenged policies. Not only were the red sticker and automatic segregation policies dropped at once by the County, *see* Item 67, but Sheriff Higgins has now informed the court that all departmental employees have received training in "Infectious/Contagious Disease Control." Item 75. All employees in 1992 will receive ongoing classroom instruction in universal precautions and the new Erie County Sheriff's Department policy and procedure to control infectious and/or contagious diseases. *See* Items 75–78. This is an excellent first step and appears to meet the court's major concerns as expressed in *Nolley*. The court very much appreciates this prompt response.

### II. DAMAGES

The issue of damages for plaintiff is considerably more complicated. In my prior order, I left unresolved whether any of the defendants might be entitled to qualified immunity, and the appropriate measure for damages. *Nolley*, 776 F.Supp. at 744. By letter of December 18, 1991, defendants informed the court that they would "not attempt to argue that defendants are immune from an award of monetary damages in this action." Item 68 at 2. Thus, there remain no issues of immunity to be disposed of prior to determining damages on each of plaintiff's claims.

#### A. *Compensatory Damages*

##### 1. Privacy

 The court has found that defendants' red sticker and automatic segrega-

tion policies violated plaintiff's constitutional right of privacy under 42 U.S.C. § 1983, *Nolley*, 776 F.Supp. at 743, as well as plaintiff's statutory right of privacy under article 27–F of New York State's Public Health Law. *Id.* at 725–28, 733–34. The statutory violations, however, merely parallel the injury to plaintiff's constitutional privacy interests.

Plaintiff seeks to recover presumed damages for the injury to her privacy. Defendants argue that presumed damages may not be awarded for the violations proved by plaintiff. Plaintiff must show actual injury, defendants contend; and since plaintiff has been unable to show such injury for her privacy claims, only nominal damages should be awarded.

To determine an appropriate measure of damages, the court must first decide whether presumed damages are proper in these circumstances. In arguing for presumed damages, plaintiff relies chiefly on language from the case of *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). In *Stachura*, the Supreme Court reviewed the question whether damages under § 1983 could be awarded based on the perceived value of the constitutional right that had been abridged. The Court held that they could not. *Id.* at 310, 106 S.Ct. at 2544. Damages under § 1983 are to be decided based on the principles of common law tort. *Id.* at 306, 106 S.Ct. at 2542. Such damages, aside from those that are punitive, are designed to compensate the plaintiff for the injury caused by defendants' breach of duty. *Id.* Where no injury is present, no compensatory damages may be awarded. *Id.* at 308, 106 S.Ct. at 2543.

Although there must be an "actual injury" to recover under § 1983, the Court found that this requirement was not at odds with the doctrine of presumed damages, because presumed damages are compensatory, even if the injury they are designed to compensate for can only be presumed to have occurred.

When a plaintiff seeks compensation for an injury that is likely to have occurred

but difficult to establish, some form of presumed damages may possibly be appropriate. *See Carey [v. Piphus]*, 435 U.S. [247,] 262 [98 S.Ct. 1042, 1051, 55 L.Ed.2d 252] [ (1978) ]; *cf. Dun & Bradstreet, Inc. v. Greenmoss Builders*, 472 U.S. 749, 760–761 [105 S.Ct. 2939, 2946, 86 L.Ed.2d 593] (1985) (opinion of Powell, J.); *Gertz v. Robert Welch, Inc.*, [418 U.S. 323,] 349 [94 S.Ct. 2997, 3011, 41 L.Ed.2d 789] [ (1974) ]. In those circumstances, presumed damages may roughly approximate the harm that plaintiff suffered and thereby compensate for harms that may be impossible to measure. *Stachura*, 477 U.S. at 310–11, 106 S.Ct. at 2545. Based on this language, plaintiff argues that the injuries to plaintiff's privacy are of the kind that are "likely to have occurred but difficult to establish...." *Id.* at 311, 106 S.Ct. at 2545.

There is an initial difficulty with plaintiff's argument. The cases cited by the Court in the just-quoted passage from *Stachura—Carey, Dun & Bradstreet*, and *Gertz*—discussed presumed damages only for the tort of defamation *per se*. In *Gertz*, the Court, weighing countervailing interests under the First Amendment, disallowed presumed damages in defamation cases when liability was not "based on a showing of knowledge of falsity or reckless disregard for the truth," *i.e.*, actual malice. *Gertz*, 418 U.S. at 349, 94 S.Ct. at 3011. This holding was modified, however, in *Dun & Bradstreet*, where the Court held that presumed damages *are* permitted in defamation cases, even without a showing of actual malice, when the defamatory statements do not involve matters of public concern. *Dun & Bradstreet*, 472 U.S. at 763, 105 S.Ct. at 3426. *See Davis v. Ross*, 107 F.R.D. 326, 329–30 (S.D.N.Y.1985) (discussing changes in New York law stemming from *Gertz* and *Dun & Bradstreet*). *Cf. Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 926–27 (2d Cir.1987). Presumed damages have been permitted for the tort of defamation *per se* because

those forms of defamation that are actionable *per se* are virtually certain to cause serious injury to reputation, and ... this kind of injury is extremely diffi-

cult to prove.... Moreover, statements that are defamatory *per se* by their very nature are likely to cause mental and emotional distress, as well as injury to reputation, so there arguably is little reason to require proof of this kind of injury either.

*Carey*, 435 U.S. at 262, 98 S.Ct. at 1051–52.

Plaintiff argues that the reasons supporting an award of presumed damages in defamation *per se* cases are equally valid with respect to the privacy tort proven here. Several commentators have urged this result. *See, e.g.,* Jean C. Love, *Presumed General Compensatory Damages in Constitutional Tort Litigation: A Corrective Justice Perspective*, 49 Wash. & Lee L.Rev. 67, 67, 70–71 (1992); Robert C. Post, *The Social Foundations of Privacy: Community and Self in the Common Law Tort*, 77 Cal.L.Rev. 957, 964–66 (1989). Indeed, in one of the most influential law review articles written on the right to privacy, Messrs. Warren and Brandeis argued that "[t]he remedies for an invasion of the right of privacy are ... suggested by those administered in the law of defamation...." Samuel Warren & Louis Brandeis, *The Right to Privacy*, 4 Harv.L.Rev. 193, 219 (1890).

This sentiment was adopted in the first Restatement of Torts, which stated that damages in a privacy action "can be awarded in the same way in which general damages are given for defamation." Restatement of Torts § 867 cmt. d (1939). The second Restatement phrases the elements of damage somewhat differently, stating:

> One who has established a cause of action for invasion of h[er] privacy is entitled to recover damages for
>
> (a) the harm to h[er] interest in privacy resulting from the invasion;
>
> (b) h[er] mental distress proved to have been suffered if it is of a kind that normally results from such an invasion; and
>
> (c) special damage of which the invasion is a legal cause.

Restatement (Second) of Torts § 652H (1977). *See Benally v. Hundred Arrows Press, Inc.,* 614 F.Supp. 969, 981 (D.N.M.

1985), *rev'd on other grounds sub nom., Benally v. Amon Carter Museum of Modern Art,* 858 F.2d 618 (10th Cir.1988). Under comment "a," the Restatement drafters explain that the first of these three categories of damages is designed to permit a plaintiff to "recover for the harm resulting to h[er] reputation" from the public disclosure of private facts about her. *Id.,* cmt. a. Thus, injury to reputation is separate from, and may be recovered in addition to, the emotional distress caused by an unwarranted disclosure. It is the injury to reputation that is presumed in a case of defamation *per se.*

In an early, influential decision, a California Court of Appeal characterized the injury in a privacy case somewhat differently.

> The gist of the cause of action in a privacy case is not injury to the character or reputation, but a direct wrong of a personal character resulting in an injury to the feelings without regard to any effect which the publication may have on the property, business, pecuniary interest, or the standing of the individual in the community.... The right of privacy concerns one's own peace of mind, while the right of freedom from defamation concerns primarily one's reputation.... The injury is mental and subjective. It impairs the mental peace and comfort of the person and may cause suffering much more acute than that caused by a bodily injury.

*Fairfield v. American Photocopy Equip. Co.,* 138 Cal.App.2d 82, 291 P.2d 194, 197 (1955). *Accord Wood v. Hustler Magazine, Inc.,* 736 F.2d 1084, 1088 (5th Cir. 1984), *cert. denied,* 469 U.S. 1107, 105 S.Ct. 783, 83 L.Ed.2d 777 (1985); *Candebat v. Flanagan,* 487 So.2d 207, 212 (Miss.1986). The court went on to explain that

> In a case of this character there can be no direct evidence of the amount of damages sustained, nor the amount of money which will compensate for the injury. The measure of damages therefore is for the trier of fact, and in assessing such damages he is accorded a wide and elastic discretion.

*Fairfield,* 291 P.2d at 198. Two courts in this circuit have awarded substantial damages based on these principles. *Socialist Workers Party v. Attorney Gen. of the United States,* 642 F.Supp. 1357, 1418–23 (S.D.N.Y.1986) ($96,500 awarded for privacy invasion stemming from 193 FBI burglaries; $125,000 awarded for loss of privacy based on work of 99 informants); *Birnbaum v. United States,* 436 F.Supp. 967, 987–89 (E.D.N.Y.1977), *aff'd in part and rev'd in part,* 588 F.2d 319 (2d Cir.1978) (awarding $1,000 each to three plaintiffs for the violations to their privacy, plus the mental distress which followed, from government agents opening their mail).

Based on the above, the court concludes that presumed damages are appropriate in a cause of action founded on the unwarranted disclosure of a person's HIV status. As the court noted in *Nolley,* " 'it is difficult to argue that information about this disease is not information of the most personal kind....' " *Nolley,* 776 F.Supp. at 731 (quoting *Woods v. White,* 689 F.Supp. 874, 876 (W.D.Wis.1988), *aff'd without opinion,* 899 F.2d 17 (7th Cir.1990)). Unwarranted release of this information is virtually certain to cause some injury, yet be the type of injury that is very difficult to prove. It is also likely to cause mental distress. Presumed damages are an expedient way to compensate plaintiff for the injuries she no doubt suffered from defendants' red sticker alert and segregation policies. It must be remembered in this regard that defendants' red sticker policy, which was in effect throughout plaintiff's three confinements, indiscriminately exposed plaintiff's sensitive condition to dozens of persons. *Nolley,* 776 F.Supp. at 720. Accordingly, the court concludes that plaintiff is entitled to presumed damages for the injury to her interest in privacy.

This conclusion is consistent with article 27–F of the New York Public Health Law, which provides for a civil penalty up to $5,000 for each disclosure of confidential HIV-related information in violation of § 2782 of the Act. N.Y. Pub. Health Law § 2783(1)(b). The existence of article 27–F indicates that the New York Legislature is concerned with the unauthorized disclosure of a person's HIV status and the potential injury that such disclosure can cause. In *V. v. State,* 150 Misc.2d 156, 566 N.Y.S.2d 987, 988–89 (Ct.Cl.1991), the Court of Claims permitted an inmate to proceed with a private right of action for damages under article 27–F. The claimant alleged that correction officers at the Attica Correctional Facility gained improper access to his medical files and made unauthorized disclosures of his HIV status. *Id.* 566 N.Y.S.2d at 990. Although the court did not reach the question, it suggested that a private claimant might be entitled to civil damages up to the statutory civil penalty of $5,000 for each disclosure of confidential HIV-related information. *Id.* In *Doe v. Roe,* No. 92–1462 (N.Y.Sup.Ct., Onondaga County, July 31, 1992), a case just decided in New York Supreme Court, the court agreed that a private right of action for damages is available under article 27–F. *Id.,* slip op. at 41–43. *Doe* involved a New York doctor's alleged improper disclosure of confidential HIV-related information to the Pennsylvania Bureau of Workers Compensation. On the issue of damages, the court went farther than *V. State,* when it held:

> the amount of civil damages recoverable in an action under [article 27–F] is not limited by the civil penalties provision of Public Health Law § 2783(1)(b) inasmuch as that provision refers to civil penalties recoverable by the Commissioner of Health.

*Id.* at 43. Neither *V. v. State* nor *Doe v. Roe* expressly tackled the question of presumed damages for violations of privacy. Nevertheless, both cases support the conclusion that significant civil damages may be appropriate in such cases.

Before determining an award of presumed damages, the court will also consider the mental distress caused to plaintiff by the disclosure of her HIV status. An award of damages for mental distress stemming from a constitutional tort is always appropriate. *Stachura,* 477 U.S. at 307, 106 S.Ct. at 2543; *Carey v. Piphus,* 435 U.S. at 264, 98 S.Ct. at 1052; *Gertz,* 418 U.S. at 350, 94 S.Ct. at 3012; *Baskin v.*

*Parker,* 602 F.2d .1205, 1209–10 (5th Cir. 1979). Mental distress is also a significant component of damages in privacy cases. *E.g., Wood v. Hustler Magazine,* 736 F.2d at 1088; *Birnbaum,* 436 F.Supp. at 988–89; *Fairfield,* 291 P.2d at 197; *Candebat,* 487 So.2d at 210; Restatement (Second) of Torts § 652H.

■ Louise Nolley was clearly upset by the disclosure of her HIV status, although she did not expressly link the emotional distress she was suffering to such disclosures. Plaintiff proved three disclosure incidents at trial. The first incident occurred when an inmate trustee named Leroy saw the red dot on plaintiff's paperwork and asked her if she had AIDS. *Nolley,* 776 F.Supp. at 720. The second incident occurred during a trip to court in Cheektowaga when a matron named Vi indicated to plaintiff that she knew plaintiff had AIDS. This upset plaintiff enough that she complained of the matron's statement to the judge. Nevertheless, on a return visit to the court, matron Vi informed plaintiff's transporting officer, Deputy Lonnie Williams, that plaintiff had AIDS and gave the officer green surgical gloves to wear while handling plaintiff. Subsequently, plaintiff's cousin, Layna Williams, apparently after learning about plaintiff's condition from Lonnie Williams, asked plaintiff if she was okay. *Id.* at 720–21. The third incident occurred when a transporting deputy denied another inmate's request to ask plaintiff for a cigarette. The deputy indicated that plaintiff had AIDS. *Id.* at 721. Plaintiff was upset by this incident and complained to supervisors at ECHC. Nolley, Aug. 21, 1990, at 54–59.

In addition to testifying about the three disclosures, plaintiff testified at length about the mental distress she suffered as a result of being segregated in Female Delta. This testimony is discussed at length below. Some of this distress, including plaintiff's contemplation of suicide, *id.* at 74, must be attributed to defendants' red sticker and segregation policies, which disclosed plaintiff's HIV status to a wide number of individuals.

Accordingly, plaintiff is entitled to damages for mental distress stemming from the unwarranted disclosure of her HIV status.

■ The amount of damages remains to be determined. Plaintiff seeks damages of $200 for each of the 310 days of her incarceration, for a total of $62,000. Plaintiff argues that although there is no proof that her HIV status was revealed each day, it could have been because the red sticker and segregation policies were always in effect. Moreover, plaintiff argues that since article 27–F of the New York Public Health Law allows for a civil penalty of up to $5,000 *per disclosure,* N.Y.Pub.Health Law § 2783(1)(b), her request of $200 per day in damages is very modest.

The court is persuaded that significant damages are appropriate in this case. In *Billings v. Atkinson,* 489 S.W.2d 858, 861 (Tex.1973), the Texas Supreme Court upheld an award of $10,000 in compensatory damages for an invasion of privacy by an illegal wiretap of plaintiff's home telephone. In *Diaz v. Oakland Tribune, Inc.,* 139 Cal.App.3d 118, 188 Cal.Rptr. 762, 774–75 (1983), a California Court of Appeal sustained a jury award of $250,000 for emotional distress stemming from public disclosure in defendant's newspaper of the fact that plaintiff was transsexual. The court is also persuaded that awarding damages on a per-day basis—since the red sticker and segregation policies were in effect for each of plaintiff's 310 days of confinement—offers a pragmatic approach to setting a dollar award. *See infra* § II(A)(2) (discussing per diem award for due process violation). Accordingly, based on defendants' constitutional and statutory violations of plaintiff's privacy rights, the court awards plaintiff damages for her mental distress in the amount of $20 per day for each of her 310 days in confinement, for a total of $6,200, and presumed damages in the amount of $10 per day for 310 days, for a total of $3,100. The award of $9,300 is against all four defendants, since each was involved in the denial of plaintiff's privacy rights. *See Nolley,* 776 F.Supp. at 720–21.

### 2. Due Process

■ Plaintiff is also entitled to recover compensatory damages under § 1983 for the mental and emotional distress which resulted from the denial of due process. *Carey v. Piphus,* 435 U.S. at 264, 98 S.Ct. at 1052. *See Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 581 (2d Cir. 1989). If, however, the deprivation which resulted from the *denial* of due process would have occurred even had plaintiff been *accorded* due process, then "the failure to accord procedural due process could not properly be viewed as the cause" of the deprivation, and damages would not be appropriate. *Carey,* 435 U.S. at 260, 98 S.Ct. at 1050. *See also Patterson v. Coughlin,* 905 F.2d 564, 568 (2d Cir.1990).

■ With respect to plaintiff's 1988 and 1989 confinements, when defendants' General Order 87-14 calling for *automatic* segregation of HIV+ inmates was in effect, defendants argue that even had plaintiff been accorded a hearing, she would have been segregated in Female Delta. Accordingly, defendants urge that no damages should be awarded for these two confinements. Defendants concede, however, that because HCM 23.00.00—which prohibited segregation based solely on an inmate's HIV status—was in effect during 57 days of plaintiff's 1989/90 confinement, plaintiff should be entitled to damages of $50 per day for that period. *See* Item 80 at 18.

Defendants' argument misses the import of the court's earlier decision. In *Nolley,* the court found that defendants' policy of *automatically* segregating HIV+ inmates was not "'reasonably related to legitimate penological interests.'" *Nolley,* 776 F.Supp. at 734 (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)). Given the court's finding that this policy was irrational, *id.* at 734-36, defendants cannot argue that, merely on the basis of her HIV status, plaintiff would properly have been segregated in Female Delta during the two confinements when General Order 87-14 was

in effect. The only basis on which she could have been confined would have been if defendants had found that she was "at risk" in the general population (based on risky behavior on her part) or if her medical condition so indicated. *See id.* at 734 n. 13. No such findings were ever made. Moreover, at this point, there is no evidence that such findings would have been warranted.[1] Accordingly, defendants cannot show that the denial of due process did not cause plaintiff's segregation in Female Delta. *See Patterson,* 905 F.2d at 569-70; *H.C. by Hewett v. Jarrard,* 786 F.2d 1080, 1088 (11th Cir.1986); *King v. Higgins,* 702 F.2d 18, 19-20 (1st Cir.), *cert. denied sub nom., Vinzant v. King,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983); *Soto v. Lord,* 693 F.Supp. 8, 21 (S.D.N.Y.1988).

■ Having shown that defendants' due process violation led to plaintiff's confinement in Female Delta, plaintiff is entitled to damages for the severe emotional distress she suffered during her stay there. *Carrero,* 890 F.2d at 581; *H.C. by Hewett,* 786 F.2d at 1088; *Corriz v. Naranjo,* 667 F.2d 892, 897 (10th Cir.1981), *cert. dismissed by stipulation,* 458 U.S. 1123, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982); *Soto v. Lord,* 693 F.Supp. at 20. In *Nolley,* the court outlined the conditions plaintiff was subjected to in agonizing detail:

> The overall conditions in Female Delta were extremely stressful. Three of the five cells in the unit were used to confine inmates who were suicidal or who demonstrated severe psychiatric problems. Louise Nolley was under constant pressure from these inmates. As plaintiff testified, "[i]t was a lot of pressure. It was hectic and it was crazy. It was depressing." Nolley, Aug. 21, 1990 at 59-60.
>
> People were attempting to commit suicide. It was just never quiet. Somebody was always crying or trying to hurt theirselves [sic] and they didn't shut their doors, you know, they couldn't lock in their rooms because

---

1. Given the evidence of her T-cell count which is in the record, there was never any indication that plaintiff needed to be segregated for medi-

cal reasons. Nor is there any evidence that she acted in such a way as to pose a danger to her fellow inmates.

the officers had to be able to get right into their cells if anything happened, so they were always running around, even at night when I could lock in they could come out of their cells and be running around and asking for cigarettes and trying to kill theirself [sic], and officers always had to come up there to rescue one of them and it would take a while. It was a mental ward.

*Id.* at 59–60.

During her 1988 and 1989 confinements, plaintiff was housed with an inmate who was accused of murdering her four children. This inmate attempted suicide on a number of occasions, including at least one instance where she used her dentures to attempt to cut her wrists. After that, sheriff's deputies asked plaintiff to take her dentures away from her if she spoke of suicide. The inmate frequently described the murder of her children in gruesome detail, even while plaintiff was eating. Often the staff asked the plaintiff to give her medicine, to take spoons away from her (which she attempted to swallow), or to do other things which plaintiff claims the staff was afraid to do.

During her 1989 confinement, plaintiff was housed with another inmate who was accused of murdering her child. This inmate also spoke frequently about the murder. Plaintiff testified that staff asked her to give this inmate medication too. In the 1989 and 1989/90 confinements, plaintiff was housed with an inmate accused of helping her boyfriend commit murder. This inmate also spoke graphically of her crime. Another inmate housed with plaintiff was homosexual and approached plaintiff for sex on several occasions. Still another inmate repeatedly ate out of the garbage. Plaintiff had to get her out of the garbage and place it outside the door where she could not get to it.

*Nolley,* 776 F.Supp. at 723–24. These extremely stressful conditions led plaintiff to become weak and contemplate suicide, Nolley, Aug. 21, 1990, at 73–74; to feel constantly upset and under pressure, *id.* at 59–60, 196, 206, 224; to question her faith in God, *id.* at 73; to develop a hatred for her fellow inmates, *id.* at 201; and to cry a great deal of the time. *Id.* at 72–73, 212–13. Thus, plaintiff has introduced ample evidence of her psychological trauma to support an award of damages. *See Carrero,* 890 F.2d at 581.

 The only question remaining, then, is how much to award in damages for plaintiff's distress. In *Patterson v. Coughlin,* 722 F.Supp. 9, 11 (W.D.N.Y.1989), *aff'd in part and vacated in part,* 905 F.2d 564 (2d Cir.1990), Judge Telesca determined damages for an inmate wrongfully confined in Attica's Special Housing Unit ("SHU"). The court stated:

> Although there has been no "specific formula" for calculating actual injuries arising from wrongful confinement, ... compensatory damages have generally been awarded by comparing the conditions of the general prison population with those of isolation ... or by assessing the emotional distress that plaintiff has suffered from such punishment.

*Id.* Noting that prior cases awarding damages to an individual who has wrongfully suffered from deplorable conditions had established a $25–$100 per-day range as appropriate relief, Judge Telesca decided to award plaintiff $100 for each of the fifty-three days he was wrongfully held in SHU. *Id.*[2] *See also United States ex. rel. Larkins v. Oswald,* 510 F.2d 583, 589 (2d Cir. 1975) ($1,000 award for twelve days spent in SHU); *Maxwell v. Mason,* 668 F.2d 361, 365–66 (8th Cir.1981) ($100 per day for fourteen days in segregation); *Furtado v. Bishop,* 604 F.2d 80, 89 (1st Cir.1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980) (sustaining awards of $1,000 and $9,000 for time spent in segregation); *Charron v. Medium Sec. Inst.,* 730 F.Supp. 987, 997 (E.D.Mo.1989) ($600 for six days in segregation); *O'Connor v.*

**2.** This award was vacated on appeal, but only because it was awarded at the summary judgment stage, not after a trial on the merits. *Pat-* *terson,* 905 F.2d at 570. No such defect exists here.

*Keller*, 510 F.Supp. 1359, 1375 (D.Md.1981) ($100 per day for two days spent in isolation cell).

In this case, plaintiff asks for a per diem recovery of $200 for each of her 310 days of segregation, for a total recovery of $62,-000. She seeks this higher amount, in part, because the conditions in Female Delta were more outrageous than those in SHU and because there was no hint that plaintiff was ever a disciplinary threat at the Holding Center.

Although it is very difficult to arrive at an appropriate award in a case of this type, the court agrees with plaintiff that the conditions plaintiff was subjected to were more severe than even Attica's SHU unit. Plaintiff was subjected to constant contact with psychotic inmates who graphically described the brutal murders of their own children. This must have been especially difficult for Louise Nolley, who is both a mother and a grandmother. Moreover, plaintiff was not merely exposed to emotionally and mentally disturbed inmates, she was asked by staff at ECHC to help control their psychotic outbursts. *Nolley,* 776 F.Supp. at 723–24. Then, when plaintiff sought counseling to try to cope with the incredible stress she was under, this counseling was denied, because plaintiff was not classified as a forensic inmate. Nolley, Aug. 21, 1990, at 73. Looked at as a whole, the court finds that the psychological trauma that plaintiff was made to endure was of a kind and degree that entitles her to damages above and beyond those awarded in the cases cited above. The court also finds that the length of time plaintiff spent in segregation—310 days—*a period of time significantly longer than in any other case reviewed by the court*— greatly exacerbated the injuries to plaintiff.

Based on this evidence and these conclusions, the court awards plaintiff $125 per day for each of the 310 days of her confinement, for a total of $38,750. This is an exceptional award. It has been entered only after careful review of the particular facts of this case. The award is against all four defendants. Each had some involvement with the decision to segregate plaintiff. *See Nolley,* 776 F.Supp. at 721–23.

3. Law Library and Religious Services

The court has found that plaintiff was denied her constitutional right of access to the courts. *Nolley,* 776 F.Supp. at 741. The court also found that "the decision to deny plaintiff access to the law library and other ECHC programs was the result of an *ad hoc* policy implemented by defendant Dray." *Id.* at 725. The right of access to the courts " 'requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.' " *Id.* at 741 (quoting *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977)). The court based its finding on the fact that plaintiff was never permitted direct access to any of the volumes in the law library during her three confinements. Nor was plaintiff permitted face-to-face meetings with inmate law clerks. Her access was limited to written requests for specific materials to be copied and brought to her in Female Delta. The court found this system "woefully inadequate." *Id.*

Defendant Dray argues that plaintiff was not really denied access to persons trained in the law since, within a week of her 1988 confinement, she was assigned appointed counsel to represent her on her pending federal and state criminal matters. Moreover, plaintiff was assigned counsel to represent her in this action on May 16, 1989, during her 1989 confinement. Defendant admits that, with respect to civil matters, plaintiff was denied her right of access to courts on the thirty-two Fridays (the day inmates were permitted to attend the library) during her 1988 and 1989 confinements before the court provided counsel in this matter. Item 80 at 6. Defendant argues, however, that only nominal damages are due for these violations. *Id.* Plaintiff seeks damages of $200 per week for each of the forty-four weeks she was not permitted to attend the library.

A number of courts have distinguished between cases alleging that one of

the core requirements of *Bounds v. Smith* was violated, *i.e.,* "adequate law libraries or adequate assistance from persons trained in the law," *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498, and those merely alleging an isolated episode of access-denial or that plaintiff was denied access to resources other than legal assistance. *See, e.g., Crawford-El v. Britton,* 951 F.2d 1314, 1321–22 (D.C.Cir.1991), *petition for cert. filed,* 60 U.S.L.W. 3816 (May 14, 1992); *Sowell v. Vose,* 941 F.2d 32, 34 (1st Cir.1991); *Chandler v. Baird,* 926 F.2d 1057, 1061–63 (11th Cir.1991); *Sands v. Lewis,* 886 F.2d 1166, 1169–71 (9th Cir. 1989); *DeMallory v. Cullen,* 855 F.2d 442, 448–49 (7th Cir.1988); *Griffin v. Coughlin,* 743 F.Supp. 1006, 1022–25 (N.D.N.Y.1990). Where core requirements are at stake, plaintiff need not prove an "actual injury" from being deprived access in order to prove a constitutional violation. *Sands,* 886 F.2d at 1171; *DeMallory,* 855 F.2d at 448–49; *Griffin,* 743 F.Supp. at 1022.

Clearly, plaintiff has alleged a deprivation of the core requirements of *Bounds* in this case. Accordingly, the court did not require plaintiff to prove an "actual injury" to establish defendants' violation of her constitutional right. *Nolley,* 776 F.Supp. at 741.[3]

Defendant does not argue that plaintiff must prove an "actual injury" in this case to support the court's finding of a constitutional deprivation. Defendant does contend, however, that plaintiff must prove an "actual injury" flowing from the deprivation in order to recover more than nominal damages. *Stachura,* 477 U.S. at 308 & n. 11, 106 S.Ct. at 2543 & n. 11 ("nominal damages, and not damages based on some undefinable 'value' of infringed rights, are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury...."). *See also Carey,* 435 U.S. at 266, 98 S.Ct. at 1053. Plaintiff has identified only one injury—the delay in being able to bring, and pursue, this suit—which resulted from defendants' denial of access to the courts.

Plaintiff's first confinement was from June 14, 1988, through November 9, 1988. Plaintiff filed her initial complaint on September 13, 1988, some three months after first being subjected to the constitutional deprivations proven here. During those three months, defendant Dray denied plaintiff access to the law library or to persons trained in the law, thereby throwing a significant impediment in the way of her filing this suit. Plaintiff has not proven, however, that the delay in filing was caused by defendant's denial of access. *See Crawford-El,* 951 F.2d at 1322 (plaintiff "failed to link his deprivation to any adverse litigation effect"); *Sowell,* 941 F.2d at 35–36 (same). Absent this proof, the court will award no more than nominal damages of $1 on plaintiff's claim. *See Smith v. Coughlin,* 748 F.2d 783, 789 (2d Cir.1989); *Sahagian v. Dickey,* 827 F.2d 90, 100 (7th Cir.1987); *Ganey v. Edwards,* 759 F.2d 337, 338, 339 n. 3 (4th Cir.1985). This award is against defendant Dray only.

The court has found that plaintiff was denied her First Amendment right to attend congregate religious services. *Nolley,* 776 F.Supp. at 742. Once again, the decision to deny plaintiff access to these services was made on an *ad hoc* basis by defendant Dray. *Id.* at 725, 742. The denial of her rights was mitigated somewhat by the fact that throughout her three confinements she was permitted one-on-one meetings in Female Delta with a Catholic priest. *Id.* Moreover, plaintiff was permitted access to communal services during most of her 1989/90 confinement. Therefore, she seeks damages only for her first two confinements.

Plaintiff argues that the injuries resulting from defendants' deprivation were emotional. Given the conditions she was subjected to in Female Delta, plaintiff argues that it was particularly grievous for defendants to restrict her ability to gain solace from her religion. The court has already noted the severe emotional distress plaintiff suffered from her constant exposure to psychotic inmates in Female Delta. *See*

3. This deprivation, however, was adequately addressed by the appointment of counsel on May 16, 1989, to represent her in this action. Item 14.

*supra.* Among other emotional effects, this exposure caused Louise Nolley to question her faith in God. Nolley, Aug. 21, 1990 at 73. Defendant Dray's denial of access to congregate religious services during this difficult time must have contributed to plaintiff's distress. Plaintiff seeks damages of $50 for each of the thirty-five weeks she was denied access to religious services. The court finds this request high, but nevertheless awards $10 per week, for a total of $350. This award is for the emotional distress caused by defendant Dray's deprivation and, accordingly, is against him only. The court has taken defendant's mitigation efforts into account.

### B. *Punitive Damages*

 Plaintiff seeks punitive damages against Superintendent John Dray. Plaintiff argues that Superintendent Dray's decisions to ignore current medical information about AIDS and overrule ECHC policies with respect to housing plaintiff and denying her access to the law library and congregate religious services warrant exemplary damages. Defendant counters that his actions were not motivated by malice or evil intent, since provisions were made, albeit very limited, to permit plaintiff to access the law library and a Catholic chaplain. Defendant also argues that his decision to reject current medical information about AIDS was motivated by the desire to take an overly cautious approach to the serious health risks posed by the disease.

The standard for assessing punitive damages in § 1983 actions was set forth by the Supreme Court in *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983):

> We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.

*Id.* at 56, 103 S.Ct. at 1640. *See also Vasbinder v. Ambach,* 926 F.2d 1333, 1342 (2d Cir.1991). "The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Stachura,* 477 U.S. at 306 n. 9, 106 S.Ct. at 2543 n. 9. *See also In re Air Disaster at Lockerbie, Scotland,* 928 F.2d 1267, 1272 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991) (reviewing history of punitive damages).

Applying this standard to the facts here, the court concludes that punitive damages are warranted. As the court found in its earlier opinion, Superintendent Dray, although informed by 1987 that AIDS could not be transmitted by casual contact,

> believed that HIV could be transmitted through saliva, tears, spit, mucus, urine and feces, by casual contact, by plaintiff using the typewriter in the law library, and even by coming into contact with plaintiff's personal items but not plaintiff.

*Nolley,* 776 F.Supp. at 719. Defendant Dray also admitted that, in making decisions about plaintiff, he substituted his layman's judgment about the risks of HIV transmission for the best medical information available at the time. *Id.* at 719 n. 1. Based on his layman's judgment, Superintendent Dray then overruled ECHC policy and decided on an *ad hoc* basis that plaintiff was to be denied access to the law library and to church services. *Id.* at 724–25.

The court also finds that the decision to keep plaintiff segregated in Female Delta—in violation of due process and ECHC policies—must be attributed to defendant Dray. General Order 87–14, which was in effect throughout plaintiff's three confinements, called for automatic segregation of all known HIV+ inmates. *Id.* at 721–22. By plaintiff's third confinement, however, this order was contradicted by ECHC Medical Policy and Procedure HCM 23.00.00, issued in December, 1989, which called for housing decisions *not* to be made solely on the basis of an inmate's HIV status. *Id.* at 722. HCM 23.00.00 did allow for segregation of HIV+ inmates, but only after a finding of medical risk or behavioral problems on the part of the inmate. No such findings were ever made. *Id.* Superinten-

dent Dray was the official most responsible for keeping plaintiff segregated after the change in ECHC policy. Once again, he ignored ECHC policy by continuing to segregate her solely on the basis of her HIV status.

Even had HCM 23.00.00 never been written, however, the court would still find defendant Dray's actions in keeping plaintiff segregated in Female Delta to be reprehensible. This was not an administrative segregation done on a temporary basis, or done to protect the inmate. As the court found previously, confinement in Female Delta was *qualitatively* different from the punishment normally suffered by a person convicted of a crime. *Id.* at 738. Louise Nolley, a perfectly sane inmate, was placed in close contact with inmates who were suicidal and psychologically unstable. Mr. Dray acknowledged that inmates should not be subjected to the kind of psychological pressures that Louise Nolley was forced to endure. *Id.* But what made defendant's decision to segregate plaintiff so ignoble was its *permanent* duration, with no administrative review whatsoever.

In *H.C. by Hewett v. Jarrard,* 786 F.2d at 1089, the Eleventh Circuit found the superintendent of a juvenile detention center liable for punitive damages for shackling a juvenile to a bed in an isolation cell for seven days. As one of the reasons supporting the award, the court stated: "We further conclude that no reasonable person could believe that a juvenile detainee may be placed indefinitely in isolation and the 'key thrown away,' i.e.—no notice of charges or hearing provided the detainee." *Id.* The juvenile in *H.C. by Hewett* was confined for seven days. Louise Nolley was segregated for *310* days.

The court concludes that the decisions by Superintendent Dray to permanently segregate plaintiff, and to deny her access to the law library and church services, represented a reckless and callous disregard for her rights. These decisions were made under the guise of "safety," but defendant Dray had no medical evidence to support them. Moreover, for the most part, Mr. Dray was acting counter to ECHC's own policies.

Accordingly, punitive damages will be awarded. The court must now decide an appropriate amount.

■ Plaintiff seeks punitive damages in the amount of $100,000—part of which plaintiff is willing to have set aside for educational programs on HIV and AIDS at ECHC—for defendant Dray's indefensible conduct. In support of the size of this award, plaintiff cites *Ismail v. Cohen,* 899 F.2d 183, 187 (2d Cir.1990), in which the Second Circuit restored a punitive damage award of $150,000 against a New York City police officer who made an unprovoked assault on a motorist, arrested him, and then lied at his trial. In upholding the award's size, the court cited two other Second Circuit decisions involving police misconduct where punitive damage awards of $175,000 and $185,000 were sustained. *Id.* In the second of these cases, *O'Neill v. Krzeminski,* 839 F.2d 9, 13 (2d Cir.1988), which involved a beating by police, the *Ismail* court noted that "the facts of *O'Neill* involved no criminal prosecution or permanent physical or emotional injury." *Ismail,* 899 F.2d at 187.

Louise Nolley was not subjected to physical abuse during her stay at ECHC, but she was subjected to near-constant emotional and psychological trauma. In addition, she was deprived of access to the law library, which was the only resource she had to fight against the conditions at ECHC. *See Abdul–Akbar v. Watson,* 775 F.Supp. 735, 754 (D.Del.1991) (awarding punitive damages of $750 to inmate whose law-library access was limited). Finally, she was prevented from attending church services at a time when her faith in God was being tested. The court feels that $20,000 is an appropriate amount for punitive damages against defendant Dray.

## V. ATTORNEYS' FEES

■ Plaintiff seeks attorneys' fees and costs pursuant to 42 U.S.C. § 1988. Defendants concede that plaintiff is the prevailing party in this action. Defendants also concede that the claims upon which plaintiff did not prevail were related to plaintiff's successful claims. The court agrees.

**912**

There is no question that plaintiff has obtained excellent results in this case due to the conscientious and diligent efforts of her attorney. Accordingly, the court feels that plaintiff's attorney should recover a fully compensatory fee. *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983).

Defendants' main objection is that plaintiff's initial request included time spent on unrelated matters. Plaintiff has adjusted her request to eliminate this time. Her current request is for $82,527.00 in attorneys' fees and costs of $4,049.04. *See* Items 70, 85–86. The request for costs incorporates an agreement made between the parties at oral argument over the expert witness fees for Dr. Ross Hewitt. Defendants agreed to pay one-half of Dr. Ross's $2,450.00 fee. *See West Virginia Univ. Hosp. v. Casey,* —— U.S. ——, ——, 111 S.Ct. 1138, 1146, 113 L.Ed.2d 68 (1991). The court hereby awards attorneys' fees in the amount of $82,527.00 and costs of $4,049.04.

## VI. CONCLUSION

Plaintiff's motion for injunctive relief is denied. Defendants have promptly and adequately responded to this court's earlier decision.

Plaintiff is awarded compensatory damages of $9,300.00 against all defendants for the violation of her privacy rights. Of these damages, $6,200.00 is for plaintiff's emotional distress, and $3,100.00 is presumed damage.

Plaintiff is awarded compensatory damages of $38,750.00 against all defendants for the emotional distress she suffered as direct result of defendants' denial of her due process rights.

Plaintiff is awarded nominal damages of $1.00 against defendant Dray for the abridgment of her right of access to the courts.

Plaintiff is awarded compensatory damages of $350.00 against defendant Dray for the emotional distress she suffered from being denied access to congregate religious services.

Plaintiff is awarded punitive damages of $20,000.00 against defendant Dray for his actions in segregating plaintiff, and in denying her access to the courts and church services.

The total of the awards to plaintiff is $68,401.00.

Finally, plaintiff's attorney is awarded fees in the amount of $82,527.00 and costs in the amount of $4,049.04.

Judgment shall enter in accordance with this decision and order.

So ordered.