

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2008

# Pichler v. UNITE

Precedential or Non-Precedential: Precedential

Docket No. 06-4522

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Pichler v. UNITE" (2008). *2008 Decisions.* Paper 455.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/455

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 06-4522
06-4721

ELIZABETH PICHLER; KATHLEEN F. KELLY; RUSSELL
CHRISTIAN; DEBORAH BROWN; SETH NYE; HOLLY
MARSTON; KEVIN QUINN; JOSE L. SABASTRO;
DEBORAH A. SABASTRO; THOMAS RILEY; AMY RILEY;
RUSSELL DAUBERT; CARRIE DAUBERT

v.

UNITE (UNION OF NEEDLETRADES, INDUSTRIAL AND
TEXTILE EMPLOYEES, AFL-CIO), A NEW YORK
UNINCORPORATED ASSOCIATION; BRUCE RAYNOR, A
NEW YORK RESIDENT; INTERNATIONAL
BROTHERHOOD OF TEAMSTERS AFL-CIO, DOES 1-10

UNITE HERE,

Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 04-cv-02841)
District Judge:  Hon. Stewart Dalzell

Argued December 6, 2007

Before:  SLOVITER, CHAGARES, and HARDIMAN, <u>Circuit
Judges</u>.

(Filed: September 9, 2008)

Paul R. Rosen
David B. Picker (Argued)
Spector Gadon & Rosen, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
Counsel for Appellant/Cross-Appellee

Lawrence T. Hoyle, Jr. (Argued)
Arlene Fickler
Arleigh P. Helfer III
John R. Timmer
Hoyle, Fickler, Herschel & Mathes LLP
One South Broad Street, Suite 1500
Philadelphia, PA 19107
Counsel for Appellee/Cross-Appellant

OPINION OF THE COURT

CHAGARES, Circuit Judge.

This case presents several issues of first impression in this court of appeals regarding application of the Driver's Privacy Protection Act of 1994 (the DPPA), 18 U.S.C. §§ 2721-2725. After certifying a class to proceed against the defendant-labor union, the District Court construed certain provisions of the DPPA and granted summary judgment to all but three of the named plaintiffs (plaintiffs). The court found that the union's labor organizing activities violated plaintiffs' privacy rights under the DPPA and awarded monetary and injunctive relief. However, the court granted the union summary judgment on plaintiffs' claims for punitive damages and dismissed the claims of the three other plaintiffs. The court deferred judgment as to class-wide relief, awaiting appellate clarification on the novel issues raised. Both sides have appealed. We will affirm in part, vacate in part, and remand for further proceedings.

2

I.

In the fall of 2002, the Union of Needletrades, Industrial &
Textile Employees AFL-CIO (UNITE)[1] decided to launch a union
organizing campaign targeting Cintas Corporation (Cintas). Cintas,
the largest domestic employer in the industrial laundry industry, is
philosophically opposed to unions and union organizing. UNITE
was concerned with what it saw as Cintas' low wages, poor
benefits, unsafe working conditions, discriminatory practices, and
violations of various labor laws. The International Brotherhood of
Teamsters AFL-CIO (Teamsters) already represented some Cintas
employees, and the two unions therefore agreed to work together
on the campaign.[2]

From its inception, a major component of the campaign to
organize and unionize Cintas workers was finding potential legal
claims against Cintas. UNITE sought to use litigation as a means
of raising the standards in the industrial laundry industry, and to
demonstrate to Cintas' employees the effectiveness and usefulness
of labor organizing. UNITE believed that house calls were
essential to the campaign's success because it thought workers
would be reluctant to talk to union organizers at work for fear of
retaliation by Cintas management. In order to contact employees,
UNITE compiled lists of names and addresses of presumed Cintas
workers from a variety of sources. Among these sources, UNITE
used license plate numbers on cars found in Cintas parking lots to
access information contained in state motor vehicle records relating
to those license plates. This technique is known as "tagging."

---

[1] In July of 2004, UNITE merged with the Hotel Employees
and Restaurant Employees International Union (HERE), and the
combined entity has become known as "UNITE HERE." For the
sake of simplicity, we will refer to the entity that is a defendant in
this case as "UNITE."

[2] The Teamsters, however, are no longer a party to this case.
The District Court approved a settlement between the Teamsters
and the plaintiffs and dismissed the Teamsters from the case. See
Pichler v. UNITE, 446 F. Supp. 2d 353, 365 (E.D. Pa. 2006).

Generally, UNITE organizers would enter or observe a Cintas parking lot and either write down or dictate into a tape recorder the license plate numbers on cars seen parked in, entering, or leaving the lot. The organizers would then take their lists of license plate numbers and access motor vehicle records either by using a Westlaw database or through private investigators or "information brokers." Appendix (App.) 229. The information brokers would—either directly or through intermediaries—obtain the information by applying to state motor vehicle bureaus.

Through these methods, UNITE accessed the motor vehicle records of the plaintiffs and a plaintiff class estimated by the parties to consist of between 1,758 and 2,005 Cintas employees, or relatives or friends of Cintas employees. UNITE visited the homes of many of these class members as well. During one such home visit on February 7, 2004, two women approached the house of plaintiff Kevin Quinn and rang his doorbell. When Quinn opened the door, they asked for him by name. He replied "That's me." App. 238. When the women informed him that "they were organizing a union campaign against Cintas," he told them he was not interested and shut the door. Id. The women returned to their car and departed.

In addition to Quinn, plaintiffs include other individuals employed by Cintas at all times relevant to this case—Elizabeth Pichler, Jose Sabastro, Thomas Riley, Seth Nye, and Russell Daubert.[3] Plaintiffs also include several non-Cintas employees—Russell Christian, Deborah Sabastro, Carri Daubert, Holly Marston, and Amy Riley. Russell Christian is the boyfriend and housemate of Cintas employee Kathleen Kelly (who the District Court dismissed for lack of standing).[4] Christian owns the

---

[3] The caption contains the name of one additional plaintiff—Deborah Brown. Brown stipulated to the dismissal of her claim without prejudice, and so her claim is not now before us. See Pichler v. UNITE, 228 F.R.D. 230, 240 (E.D. Pa. 2005).

[4] Unlike the District Court's finding that Deborah Sabastro and Carri Daubert lacked standing, plaintiffs have not appealed the similar dismissal of Kathleen Kelly. Appellant Br. at 49.

4

car Kelly drives and is the person whose motor vehicle records UNITE accessed.  When a UNITE organizer came to their home, he asked to speak to Christian.  Holly Marston is the mother of Seth Nye, and the two co-own the car whose records were accessed (thereby obtaining the identities of both individuals).  Amy Riley is Thomas Riley's wife, and they co-own the car whose records were searched as well.  Deborah Sabastro and Carri Daubert are the wives of Jose Sabastro and Russell Daubert, but UNITE accessed only their husbands' motor vehicle records as their cars were registered to their husbands.  The court dismissed both wives' claims for lack of standing.

The original complaint in this case was filed on June 28, 2004.  App. 27.  Shortly thereafter, plaintiffs filed a one-count amended class action complaint alleging that the Teamsters, UNITE, and UNITE's President, Bruce Raynor, violated the DPPA.

On May 31, 2005, the court certified a class to proceed against UNITE, though not against Raynor, and dismissed the claims of Kathleen Kelly, Carri Daubert, and Deborah Sabastro for lack of standing.  See Pichler v. UNITE, 228 F.R.D. 230 (E.D. Pa. 2005) (Pichler I).  On August 30, 2006, the court granted summary judgment against UNITE and awarded the plaintiffs $2,500 each, and granted summary judgment in favor of Raynor.  See Pichler v. UNITE, 446 F. Supp. 2d 353 (E.D. Pa. 2006) (Pichler II).  Pursuant to Federal Rule of Civil Procedure 54(b), the court also certified the case for appellate review, deferring the questions about class-wide and injunctive relief.  Finally, on October 17, 2006, the court amended its previous judgment and granted UNITE summary judgment on the issue of punitive damages.  See Pichler v. UNITE, 457 F. Supp. 2d 524 (E.D. Pa. 2006) (Pichler III).  The court also granted separate awards to Thomas Riley and Amy Riley, co-owners of a vehicle whose records UNITE searched,[5] and permanently enjoined UNITE and its employees from using or

---

[5] The court had already granted separate awards to co-owners Seth Nye and Holly Marston in its August 30, 2006 judgment.

5

disclosing any of the plaintiffs' personal information obtained by UNITE in violation of the DPPA. This appeal followed.

## II.

The District Court had subject matter jurisdiction over this federal question action under 28 U.S.C. § 1331. We have jurisdiction over this appeal from the final decision of the District Court pursuant to 28 U.S.C. § 1291.[6]

---

[6] We agree with the parties that the District Court properly certified this case pursuant to Federal Rule of Civil Procedure 54(b). See 10 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2654 (3d ed. 1998) (explaining Rule 54(b)'s goal of avoiding "the possible injustice of a delay in entering judgment . . . as to fewer than all of the parties until the final adjudication of the entire case by making an immediate appeal available"). There are two basic conditions on the rule's applicability: "(1) there has been a final judgment on the merits, i.e., an ultimate disposition on a cognizable claim for relief; and (2) there is 'no just reason for delay.'" Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 202 (3d Cir. 2006) (quoting Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 7-8 (1980)).

In this case, both requirements are met. The District Court granted summary judgment as to UNITE's liability under the DPPA and addressed all remedial issues except attorneys' fees—granting liquidated damages, denying punitive damages, and granting injunctive relief. See Budinich v. Becton Dickinson & Co., 486 U.S. 196, 199-203 (1998) (explaining that a decision on the merits is a final decision as a matter of federal law under 28 U.S.C. § 1291 even when the recoverability or amount of attorneys' fees for the litigation remains to be determined). Thus, all the rights and liabilities of UNITE, vis-a-vis the plaintiffs, have been fully adjudicated and finally decided. So too, the District Court found no just reason for delaying an appeal, and explained its rationale for this finding. See Carter v. City of Philadelphia, 181 F.3d 339, 346 (3d Cir. 1999) (requiring that district courts explain their reasons for certifying a judgment for appeal under

6

We review the District Court's construction of federal statutes <u>de novo</u>. <u>Chao v. Cmty. Trust Co.</u>, 474 F.3d 75, 79 (3d Cir. 2007). We also review a grant or denial of summary judgment <u>de novo</u>, applying the same standard as the District Court. <u>Marten v. Godwin</u>, 499 F.3d 290, 295 (3d Cir. 2007). Summary judgment is only appropriate if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>DL Res., Inc. v. FirstEnergy Solutions Corp.</u>, 506 F.3d 209, 216 (3d Cir. 2007). On cross-motions for summary judgment, the court construes facts and draws inferences "in favor of the party against whom the motion under consideration is made." <u>Samuelson v. LaPorte Cmty. Sch.</u>, 526 F.3d 1046, 1051 (7th Cir. 2008) (quotation marks omitted). The court may not, however, weigh the evidence or make credibility determinations as "these tasks are left for the fact-finder." <u>Pertruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.</u>, 998 F.2d 1224, 1230 (3d Cir. 1993).

## III.

Plaintiffs contend that the District Court erred in granting defendants' summary judgment motion on the issue of punitive damages and that they were denied their Seventh Amendment right to a jury trial on that issue.[7]

---

Rule 54(b)). We find no error in the District Court's finding that there was no just reason for delay. Accordingly, the requirements of Rule 54(b) are met, and we have appellate jurisdiction over the final decision of the District Court.

[7] The remedial section of the DPPA provides:

**(b) Remedies.--**The court may award--
**(1)** actual damages, but not less than liquidated damages in the amount of $2,500;
**(2)** punitive damages upon proof of willful or reckless disregard of the law;
**(3)** reasonable attorneys' fees and other litigation costs reasonably incurred; and
**(4)** such other preliminary and equitable relief as the

7

## A.

The parties filed cross-motions for summary judgment with the District Court, and submitted certain jointly stipulated facts for purposes of disposing of the motions. The court properly granted summary judgment as to UNITE's liability (except as noted in section V, infra) on the grounds that uncontroverted evidence established that UNITE acted for an impermissible purpose, in violation of the DPPA. Pichler III, 457 F. Supp. 2d at 531.

Regarding the issue of summary judgment on plaintiffs' request for punitive damages, however, the District Court seems to have applied an inappropriate standard. The court assumed that awarding remedies was simply "in its discretion." Id. at 527. Specifically, rather than determining whether there were genuine issues of material fact as to whether UNITE willfully or recklessly contravened the DPPA as § 2724(b)(2) requires, the court found that "[t]he DPPA plainly gives us the discretion to award *or* to deny punitive damages, even if UNITE violated the DPPA and did so willfully and recklessly. We must craft an appropriate award bearing in mind the purposes of the statute and the relevant jurisprudence on punitive damages." Id. at 531 (emphasis in original). In so doing, the court considered plaintiffs' arguments concerning UNITE's prior knowledge of the DPPA following UNITE's involvement in earlier litigation[8] and UNITE's continued use of motor vehicle information. The court also considered the

---

court determines to be appropriate.

18 U.S.C. § 2724(b).

[8] I n Tarkington v. Hanson and UNITE, No. 4-00-cv-00525 JMM (E.D. Ark. Aug. 25, 2000), the plaintiffs therein alleged that UNITE obtained motor vehicle license plate numbers from vehicles parked in the Dillard's Distribution Center in Mabelvale, Arkansas, which UNITE used to obtain personal information. The parties eventually settled the case. President Bruce Raynor discussed the terms of the settlement with UNITE's counsel as it was being negotiated and Raynor executed the settlement documents on behalf of UNITE. See Pichler II, 446 F. Supp. 2d at 364.

8

fact that UNITE's legal department distributed a memorandum directing its campaigners not to use "license plate numbers to obtain any information from Department of Motor Vehicles records, including names and addresses." Id. (quotation marks omitted). The court found that "this clear instruction, plus the certainty that further license plate retrievals will result in costly damages awards, will effectively deter UNITE from further violations of the DPPA. Thus, we achieve deterrence without imposing punitive damages." Id. at 532 (footnote omitted). The court refused to award punitive damages, deeming them "unnecessary" in this case. Id.

The District Court concluded that it had discretion to fashion an award, but it did not determine whether summary judgment was appropriate on the issue of punitive damages given the requirements of § 2724(b)(2). The court did not apply the standards for summary judgment, nor did it even mention summary judgment in its analysis. Furthermore, it appears that the court improperly engaged in weighing of evidence on the summary judgment record. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Bragen v. Hudson News Co., 278 F.2d 615, 618 (3d Cir. 1960). Accordingly, we will vacate the court's denial of punitive damages and remand for the court to address explicitly whether summary judgment was appropriate on the issue of punitive damages.

B.

If, on remand, the District Court determines that summary judgment is appropriate as to plantiffs' punitive damages claim, then a trial will be unnecessary. In re TMI Litig., 193 F.3d 613, 725 (3d Cir. 1999); see Tull v. United States, 481 U.S. 412, 419 (1987). However, if the District Court determines that summary judgment is inappropriate, we agree with plaintiffs that they are entitled to a jury trial on their punitive damages claim, as we discuss below.

The Supreme Court has instructed that "[b]efore inquiring into the applicability of the Seventh Amendment, we must 'first ascertain whether a construction of the statute is fairly possible by

9

which the [constitutional] question may be avoided.'" City of Monterey v. Del Monte Dunes, 526 U.S. 687, 707 (1999) (quoting Tull, 481 U.S. at 417 n.3). It is clear that the DPPA makes no mention of a right to a jury trial. As the District Court properly observed, "[t]he DPPA does not provide for a jury trial on this (or, for that matter, any) issue." Pichler III, 457 F. Supp. 2d at 531.[9] Accordingly, we must engage in a Seventh Amendment analysis. See Cox v. Keystone Carbon Co., 861 F.2d 390, 393 (3d Cir. 1988).

The Seventh Amendment provides that "in Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." U.S. Const. amend. VII. Consistent with this textual mandate that the jury right be preserved, the Supreme Court has recognized:

> our interpretation of the Amendment has been guided by historical analysis comprising two principal inquiries: "[F]irst, whether we are dealing

---

[9] UNITE argues that the language of the DPPA vests the *court*—not a jury—with discretion to award damages and, therefore, plaintiffs have no right to a jury trial. See 18 U.S.C. § 2724(b) ("The court may award . . . punitive damages . . . ."). Because "the court" can refer to the judge, the jury, or some combination of the two, we reject UNITE's argument that the language evinces Congress's clear intention to abrogate the jury trial right for punitive damages. Along these lines, the fact that the statute seems to indicate an exercise of discretion does not alter our conclusion. There is ample "historical evidence that cases involving discretionary monetary relief were tried before juries." Feltner, 523 U.S. at 353. Indeed, in Feltner, where the language of the statute seemed to demand discretion on the part of the trial judge ("the copyright owner may elect . . . an award of statutory damages . . . in a sum of not less than $500 or more than $20,000 *as the court considers just* . . . ." (emphasis added)), the Court held that "the Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages . . . including the amount itself." Id. at 355.

10

with a cause of action that either was tried at law at the time of the founding or is at least analogous to one that was. If the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791."

Del Monte Dunes, 526 U.S. at 708 (quoting Markman v. Westview Instruments, Inc., 517 U.S. 370, 376 (1996)) (quotation marks and citation omitted).

1.

Conducting the first inquiry, the Supreme Court has noted that "[t]he Seventh Amendment [] applies not only to common-law causes of action, but also to 'actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty.'" Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 348 (1998) (quoting Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 42 (1989)). To determine whether a statutory cause of action is more analogous to actions decided in courts of law or equity "we examine both the nature of the statutory action and the remedy sought." Id. It is undisputed that plaintiffs are seeking the remedy of legal relief under the DPPA. See id. at 352 ("We have recognized the 'general rule' that monetary relief is legal . . . . "). We must next determine whether civil suits seeking legal relief under the DPPA are analogous to common law causes of action ordinarily decided in courts of law in the late 18th century.

The Supreme Court in Del Monte Dunes considered, inter alia, whether an action for legal relief under 42 U.S.C. § 1983 "is an action at law within the meaning of the Seventh Amendment." 526 U.S. at 709. Recognizing that the right to a jury extends to statutory claims that did not exist at common law, the Court noted that the right inures in claims that "can be said to 'soun[d] basically in tort,' and seek legal relief." Id. (quoting Curtis v. Loether, 415 U.S. 189, 195 (1974)). The Court then looked to the statute at

11

issue and found that "there can be no doubt that claims brought pursuant to § 1983 sound in tort. Just as common-law tort actions provide redress for interference with protected personal or property interests, § 1983 provides relief for invasions of rights protected under federal law." Id. The Court concluded that because the § 1983 suit sought legal relief and sounded in tort, it was an action at law.

Like § 1983, the DPPA sounds in tort. Just as common-law tort actions provide redress for interference with protected personal or property interests, so too does the DPPA. The DPPA provides redress for violation of a person's protected interest in the privacy of his or her motor vehicle records and the identifying information therein. Accordingly, plaintiffs' claims for legal relief under the DPPA are analogous to common law causes of action ordinarily decided in the courts of law in the late 18th century. Cf. Samuel Warren & Louis D. Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 213 n.1 (1890) (noting that "the common law has for a century and a half protected privacy in certain cases").

2.

Having established that "the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791." Markman, 517 U.S. at 376. The Supreme Court has acknowledged that "[w]e determine whether issues are proper for the jury, when possible, 'by using the historical method' . . . look[ing] to history to determine whether the particular issues, or analogous ones, were decided by judge or by jury in suits at common law at the time the Seventh Amendment was adopted." Del Monte Dunes, 526 U.S. at 718 (quoting Markman, 517 U.S. at 378). Where an examination of history does not provide a definitive answer as to the particular issues or analogous issues, "we look to precedent and functional considerations." Del Monte Dunes, 526 U.S. at 718.

The Supreme Court has made clear that, historically, the issue of punitive damages was tried to a jury in cases sounding in tort. In Day v. Woodworth, 54 U.S. (13 How.) 363 (1851), the

12

Court acknowledged that decisions regarding punitive damages should be "left to the discretion of the jury" and noted that this principle was supported by "repeated judicial decisions for more than a century." Id. at 371; see id. (recognizing that issue of punitive damages has "always" been a jury question). In particular, the Court observed, "[i]t is a well-established priciple of the common law, that in . . . all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant . . . ." Id. Accordingly, we hold that the issue of punitive damages in cases sounding in tort (such as the DPPA) "were decided by [a] jury in suits at common law at the time the Seventh Amendment was adopted." Del Monte Dunes, 526 U.S. at 718.

Even if history did not provide a definitive answer to the question of whether the issue of punitive damages should be tried by a jury, both precedent and functional considerations support our holding. First, regarding precedent, we held in Klinger v. State Farm Mutual Auto Insurance Co., 115 F.3d 230 (3d Cir. 1997), that because punitive damages constituted traditional legal relief, the Seventh Amendment demanded that a jury assess whether punitive damages were appropriate in a statutory bad faith action. Id. at 235-36; see also Tull, 481 U.S. at 422 ("Remedies intended to punish culpable individuals . . . were issued by courts of law, not courts of equity."); Curtis, 415 U.S. at 196 (noting that the remedy of punitive damages "is the traditional form of relief sought in the courts of law"). Second, regarding functional considerations, "[i]n actions at law predominantly factual issues are in most cases allocated to the jury." Del Monte Dunes, 526 U.S. at 720. The relevant issue in this case is whether UNITE willfully or recklessly disregarded the prohibitions of the DPPA. See 18 U.S.C. § 2724(b)(2). Trial issues of willfulness and recklessness are common factual issues for juries to determine. See Metzger v. Osbeck, 841 F.3d 518, 521 (3d Cir. 1988) ("[W]e cannot deprive plaintiffs of an opportunity to have a jury resolve the issue of [defendant]'s intent in their favor."); United States v. House, 524 F.2d 1035, 1045 (3d Cir. 1975) (observing in tax evasion case that "question of wilfulness is uniquely for the trier of fact" and concluding that "[t]here was certainly a jury question with respect to [defendant's] wilfulness"); see also Fargo v. City of San Juan

13

Bautista, 857 F.2d 638, 641 (9th Cir. 1988) ("When reasonable persons may disagree as to whether particular conduct constitutes negligence, gross negligence, or recklessness, the question is one of fact to be decided by the jury.").

In sum, where there is a genuine issue of material fact regarding the willfulness or recklessness of a defendant's conduct, we hold that the Seventh Amendment requires a trial by jury on the issue of punitive damages under the DPPA.[10]

IV.

Plaintiffs next contend that the District Court erroneously dismissed the claims of Carri Daubert and Deborah Sabastro for lack of standing. UNITE searched the motor vehicle records of their husbands—Russell Daubert and Jose Sabastro—revealing the couples' shared addresses. According to the court, as neither Carri Daubert nor Deborah Sabastro were the registered owners of the vehicles about which UNITE obtained information, they suffered no invasion of an interest that the DPPA protects, and they lack standing to sue. We agree.

Article III of the Constitution limits the "judicial Power" of the United States to the adjudication of "Cases" or "Controversies." U.S. Const. art. III, § 2. Courts enforce the case-or-controversy requirement through several justiciability doctrines that "'cluster about Article III.'" Allen v. Wright, 468 U.S. 737, 750 (1984) (quoting Vander Jagt v. O'Neill, 699 F.2d 1166, 1178-79 (D.C. Cir. 1983) (Bork, J., concurring)). They include standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions. See DaimlerChrysler Corp. v. Cuno, 547 U.S.

_____

[10] It is true, as UNITE argues, that neither the DPPA nor the Seventh Amendment limits the trial judge's traditional authority to dispose of an issue before sending it to a jury where "the evidence is uncontradicted and raises only [questions] of law." See Tull, 481 U.S. at 419. This authority, however, is not so broad as to permit the judge to find facts or resolve contradictory evidence at summary judgment. See McCabe v. Ernst & Young, LLP, 494 F.3d 418, 424 (3d Cir. 2007).

14

332, 352 (2006). "[P]erhaps the most important of these doctrines" is standing. Allen, 468 U.S. at 750.

The "irreducible consitutional minimum" of Article III standing consists of the following three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (quotation marks, footnote, and citations omitted). The main issue regarding the standing of Carri Daubert and Deborah Sabastro is whether they have suffered "an invasion of a legally protected interest" under the DPPA. Id. at 560; see Warth v. Seldin, 422 U.S. 490, 500 (1975) ("The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing. . . .'") (quoting Linda R. S. v. Richard D., 410 U.S. 614, 617 n.7 (1973)).

The DPPA provides that a "person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action. . . ." 18 U.S.C. § 2724(a). The DPPA thus confers a cause of action to "the individual" whose personal information from their motor vehicle records is at issue. It is undisputed that Russell Daubert and Jose Sabastro had a viable cause of action under the DPPA because they were, respectively, "the individual" who was the registered owner of a vehicle about which UNITE obtained information. In contrast, neither Carri Daubert nor Deborah Sabastro were registered owners of the

15

vehicles and, in fact, their names did not appear anywhere on the motor vehicle records. Nonetheless, in arguing that they have standing to sue under the DPPA, they focus on the fact that they share personal information—such as their addresses—with their husbands and, therefore, the personal information "pertains" to them as well. We believe that this argument reads § 2724(a) too broadly.

The DPPA protects the privacy interests of "the individual to whom the [personal] information pertains . . . ." Id. Notably, Congress chose to employ the singular term "the individual" in this section. To adopt Carri Daubert's and Deborah Sabastro's argument, we would have to rewrite the statute to replace "the individual" with the words "any individuals." Taking their argument to its logical conclusion, the DPPA would grant a cause of action to anyone (e.g., spouses, children, parents, friends, other relatives) who, for instance, resides at an address improperly obtained from motor vehicle records.[11] This would be an unwarranted extension of § 2724(a).

The consent provisions in 18 U.S.C. §§ 2721(b)(11)-(13) support our singular reading of the phrase "the individual" in the DPPA. Section (b)(13), for instance, permits personal information from motor vehicle records to be disclosed upon the written consent of "the individual to whom the information pertains." See also id. §§ (b)(11), (12) (requiring consent of "the person to whom such personal information pertains"). If we credit plaintiffs' argument, then presumably they—or anyone—residing at their home address could consent to the release of motor vehicle records that are not their own. Put another way, under plaintiffs' argument, an extended family member or other person residing at a house would be considered any "individual to whom" the address and telephone number "pertains" and that person could consent to

_____

[11] Recognizing the implications of their argument, plaintiffs propose a limiting principle: a proper DPPA plaintiff must be "a relative by blood or marriage and member of the same household as the record owner." Appellee Reply Br. at 60. We reject this limitation as it finds no support in the language or history of the statute.

release the "personal information" of anyone else residing in the house. Such a result would run contrary to the DPPA's purpose of preserving the privacy rights of individuals.

Our view of § 2724(a) is also supported by § 2725(3), which limits the reach of the term "personal information" to "information that identifies an individual. . . ." 18 U.S.C. § 2725(3) (emphasis added). We hold that individuals such as Carri Daubert and Deborah Sabastro, who are not specifically identified in a motor vehicle record, have no legally protected privacy interest under the DPPA. See Pichler I, 228 F.R.D. at 241 (stating that UNITE "could not have violated [their] own DPPA-protected privacy interests because the motor vehicle abstracts contain no information about them"). Because Carri Daubert and Deborah Sabastro have not suffered "an invasion of a legally protected interest," they lack standing to sue, and, accordingly, we will affirm dismissal of their claims under the DPPA .

V.

Plaintiffs' final contention on appeal is that they are entitled to cumulative liquidated damages awards.[12] Specifically, they claim that the DPPA entitles them to a separate liquidated damages award for each time UNITE "obtain[ed]" or "us[ed]" plaintiffs' personal information,[13] and that the court erred by granting summary judgment to UNITE on this issue despite issues of fact as to the propriety of multiple awards. Appellant Br. at 55-56.

While both parties seem to view the statutory interpretation issue as a binary one (either allowing multiple liquidated damage awards for every obtaining or use, or not), we see the statutory

---

[12] As plaintiffs have not argued that the District Court erred by denying them a jury trial on the issue of cumulative liquidated damages awards, we need not discuss whether plaintiffs have a right to a jury trial on this issue.

[13] "Of the nine named plaintiffs, three claim they suffered two violations each and seek $5,000 per person, and six claim they suffered three violations each and seek $7,500 per person." Pichler III, 457 F. Supp. 2d at 529.

17

language as presenting a more nuanced damages scheme. There are two distinct questions: first, whether the DPPA permits a plaintiff to recover two separate liquidated damage awards because a defendant obtains and then uses plaintiff's confidential information; and second, whether the DPPA permits a plaintiff to recover multiple liquidated damage awards where a defendant has used plaintiff's confidential information on more than one occasion.

## A.

As to this first question, plaintiffs point out that the DPPA is written in the disjunctive ("a person who knowingly obtains, discloses *or* uses"), and so each act of obtaining, disclosing, or using of confidential information constitutes a separate violation of the statute. Plaintiffs contend that since the mere obtaining of personal information is a violation of the DPPA entitling a plaintiff to damages and other relief "it follows that a further *use* of that information is a separate invasion of privacy and a separate violation . . . that independently entitles the victim to the relief prescribed by section 2724(b)." Appellant Br. at 56 (emphasis in original).[14]

Merely because both obtaining and using motor vehicle information for an impermissible purpose violate the DPPA (a premise with which we agree), it does not follow that each independent violation entitles plaintiffs to a separate liquidated damages award. The key phrase for purposes of our analysis is the DPPA's provision of $2,500 in "liquidated damages." 18 U.S.C. § 2724(b)(1). The damages contemplated by the statute are not mere generic damages, see, e.g., 5 U.S.C. § 552a(g)(4)(A) ("in no case shall a person entitled to recovery receive less than the sum of $1,000"), or even "statutory damages" as such, see, e.g., 15 U.S.C. § 1117(d) (providing that instead of actual damages, a plaintiff may

---

[14] Plaintiffs do not argue, however, that mailings in connection with the Veliz v. Cintas litigation count as separate uses. Pichler III, 457 F. Supp. 2d at 529. Veliz was one of six federal cases UNITE brought or assisted in bringing against Cintas from 2002 through October 13, 2004. App. 232-34.

18

recover "an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 . . . ."), but rather *liquidated* damages. The District Court noted correctly that "Congress's decision to use the technical term 'liquidated damages' in the DPPA suggests that it intended to incorporate the locution's well-understood meaning." Pichler I, 228 F.R.D. at 244. This "well understood meaning" undermines plaintiffs' position.

Under the common law of contracts, liquidated damages reflect an ex ante agreement of the parties. See E. Allan Farnsworth, Contracts § 12.18 (4th ed. 2004) (quoting Banta v. Stamford Motor Co., 92 A. 665, 667 (Conn. 1914) ("The standard of measure here is not furnished by the plaintiff's actual loss or injury, as the event proved, but by the loss or injury which might reasonably have been anticipated at the time the contract was made. . . . It is the look forward and not backward that we are called upon to take . . . .")); see also In re Plywood Co., 425 F.2d 151, 154 (3d Cir. 1970) (describing liquidated damages under New Jersey law as "the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damage that will probably ensue from the breach, is legally recoverable as agreed damages if the breach occurs") (quotation marks and citation omitted).[15] To incorporate the meaning of the term, we construe the DPPA with an eye toward the "loss or injury which might reasonably have been anticipated." Banta, 92 A. at 667.

Congress clearly contemplated that in most cases, a defendant who obtained motor vehicle information would put it to some use. See Pichler III, 457 F. Supp. 2d at 530 ("Congress surely understood that the usual case would involve at least one instance of 'obtain[ing]' and one 'use[ ],' and it decided that a plaintiff who did not or could not show actual damages could nevertheless receive $2,500."). Therefore, given Congress's use of the term "liquidated damages" and the $2,500 amount provided, we

---

[15] In this case, of course, we have an artifically-constructed "contractual" arrangement: rather than the parties themselves agreeing on liquidated damages, Congress has forecast how these damages would likely be fixed.

conclude that this amount encompasses both aspects of a defendant's "breach" of the DPPA—one instance of obtaining and one of use—and that the defendant is limited to one liquidated damage award in this situation. A contrary holding would effectively result in a minimum award of $5,000 for every violation of the DPPA—a result we do not believe Congress intended.

In response, plaintiffs contend that this result would incentivize a defendant who has already obtained information to then use it. This argument is unpersuasive. To begin with, the DPPA provides for criminal liability, which should deter someone who has obtained confidential information from calling attention to his or her criminal conduct by using it. See Gen. Instrument Corp. of Delaware v. Nu-Tek Elecs. & Mfg., Inc., 197 F.3d 83, 95 (3d Cir. 1999). Moreover, plaintiffs are free to elect actual, rather than liquidated damages, and will certainly do so in appropriate cases. See id.[16] Further still, the DPPA permits the award of punitive damages if the standard set forth in § 2724(b)(2) is met.

B.

While we understand Congress to have forecast "liquidated damages" as $2,500 for the most likely violation of the DPPA (obtaining and using confidential information), there is no reason to think that such an amount covers all subsequent violations as well. The plain language of the statute contains no such restriction. See 18 U.S.C. § 2724(a). Accordingly, defendants can face additional damages if, after obtaining a plaintiff's personal information in violation of the DPPA, they repeatedly use or disclose that personal information.

The language of the DPPA indicates a certain degree of discretion granted to the court in awarding damages. See 18 U.S.C. § 2724(b) ("The court *may* award") (emphasis added); see also Kehoe v. Fid. Fed. Bank & Trust, 421 F.3d 1209, 1216-17 (11th Cir. 2005) ("The use of the word 'may' suggests that the award of

---

[16] In a case involving stalking, for example, the obtaining of information might cause very little actual damage, while the use of such information is where the actual damages would lie.

20

any damages is permissive and discretionary. 'This common-sense principle of statutory construction is by no means invariable . . . [but s]ince there is neither legislative history nor obvious inferences from the structure that suggests a contrary intent, we conclude that the use of the word 'may' implies a degree of discretion. Thus, the district court, in its discretion, may fashion what it deems to be an appropriate award.") (citations omitted). Given the discretionary language in the statute and that the statute contains no limitation on the ability of the district court to grant cumulative awards, we construe the DPPA to permit a district court to grant such awards upon multiple uses or disclosures of confidential information.

In this case, there appears to be evidence of multiple uses of personal information in the summary judgment record, but the District Court had a view that differed from ours regarding multiple uses or disclosures. The court did acknowledge that multiple awards of damages might be appropriate in cases where, for instance, a DPPA violator "bombarded" a plaintiff with visits and mailings. Pichler III, 457 F. Supp. 2d at 530 n.6. However, the court determined that the record did not suggest such a "gross disregard" of a plaintiffs' privacy rights. As a result, the court, relying upon its "Congressionally-authorized discretion," awarded $2,500 to each plaintiff. Id. at 530-31.

While the District Court, when all is said and done, has discretion under the DPPA to fashion an award it deems appropriate, it must address the outstanding issue of liability regarding multiple uses of personal information. The District Court must determine whether there is sufficient evidence of multiple uses to proceed beyond summary judgment. Given our construction of the DPPA and the fact that the District Court did not appear to have applied the standards for summary judgment, we will vacate its grant of summary judgment as to this issue and remand for the District Court to address explicitly whether summary judgment was appropriate on this issue.

VI.

UNITE's first contention as cross-appellant addresses the

District Court's finding of liability. UNITE claims that the court found it to have obtained plaintiffs' personal information "for a purpose not permitted" under the DPPA only by erroneously construing the DPPA's "permissible uses" of personal information.

The DPPA is structured such that § 2721(a) provides the general prohibition on the release and use of motor vehicle information, and § 2721(b) enumerates fourteen specific exceptions to the general prohibition. UNITE claims there are two exceptions which make its tagging activities permissible: the "litigation exception" and the "acting on behalf of the government" exception. See 18 U.S.C. §§ 2721(b)(1), (4).[17] The District Court carefully

_____

[17] The statutory text provides:

> **(b) Permissible uses. --** Personal information referred to in subsection (a) shall be disclosed for use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, . . . and, subject to subsection (a)(2), may be disclosed as follows:
>
> **(1)** For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.
> . . .
>
> **(4)** For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

22

analyzed the applicability of both exceptions and concluded that UNITE's activities did not fall within either. Pichler II, 446 F. Supp. 2d at 368-71.

We need not address the District Court's interpretation of the litigation and the acting on behalf of the government exceptions as we agree with the District Court that the language of the statute is clear: "The Act contains no language that would excuse an impermissible use merely because it was executed in conjunction with a permissible purpose." Id. at 367 ("[I]f UNITE had three purposes for 'obtain[ing], disclos[ing] or us[ing] [plaintiffs'] personal information' and two of those were 'permissible uses' but the third was not, UNITE would still be liable for the third purpose."). Because UNITE obtained and used the confidential information for an impermissible purpose—union organizing—it does not matter what other permissible purpose UNITE may have had.

UNITE advances a unique argument. It claims that its labor-organizing purpose may not be severed from either its litigation purpose or its acting on behalf of the government purpose. For instance, UNITE contends that its

> emphasis on litigation had a twofold purpose: raising the standards in the industry for the benefit of UNITE's members, whether or not employed by Cintas, and demonstrating to Cintas' employees the effectiveness and usefulness of organization. Thus, UNITE's activity in investigating potential litigation was part and parcel of its unionizing campaign, not separate and distinct from it.

Appellee Br. at 32.[18]

---

18 U.S.C. §§ 2721(b)(1), (4).

[18] Our dissenting colleague relies upon a quotation from Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King & Stevens, P.A., 525 F.3d 1107 (11th Cir. 2008), that regards the litigation exception. See Dissent at 3-4 (quoting Thomas, 525 F.3d

The litigation component to UNITE's campaign should not obscure what UNITE was trying to accomplish—organizing labor. The same may be said for its acting on behalf of the goverment purpose. UNITE candidly admits that it launched the "campaign to organize and unionize Cintas workers." App. 226. Moreover, the organizers themselves, in conducting their home visits, unambiguously explained that they were "organizing a union campaign against Cintas." App. 238. Regardless of UNITE's attempts to mask this clear labor-organizing purpose behind the veil of a litigation purpose or an acting on behalf of the government purpose, Congress has not permitted UNITE to do so.

The statute clearly prevents obtaining or using personal information "for a purpose not permitted under this chapter. . . ." 18 U.S.C. § 2724(a). It does not ask whether "litigation has become an increasingly important organizing tool" because "unions have found increasing resistance and difficulty using traditional organizing tactics." Appellee Br. at 31-32. The DPPA lists fourteen permissible purposes in § 2721(b) and union organizing is not one of them. Pichler II, 446 F. Supp. 2d at 367 ("As we have already held, we will not engraft upon the DPPA a 'labor exception' that would permit unions to acquire and use employees' personal information, obtained from motor vehicle records, to contact them during organizing campaigns.").[19] Like the District

at 1115 n.5). We note that the Thomas court explicitly rejected as waived the argument to which that quote pertained and, thus, the quote constitutes dicta.

[19] At oral argument, UNITE raised an alternative argument suggesting that the Court engage in a "primary" versus "secondary" purpose analysis under the DPPA in an attempt to escape liability. UNITE failed to raise this argument at all before the District Court or in any of the briefs before this Court, and only raised the argument for the first time during oral argument. Despite the dissent's comments to the contrary, we will consider this argument waived and will not address it. See Skretvedt v. E.I. DuPont De Nemours, 372 F.3d 193, 202-03 (3d Cir. 2004) ("We have held on numerous occasions that '[a]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court.'")

Court, we decline to recognize an exception to the statute for which Congress has not provided.[20]

Accordingly, we will affirm the judgment of the District Court finding that UNITE obtained and used personal information for a purpose not permitted by the DPPA.

VII.

UNITE's second argument—that civil liability requires a defendant *knowingly* obtain or disclose personal information for a use the defendant *knows* is impermissible—is patently without merit. Citing the similar language of §§ 2722 and 2724 of the DPPA, UNITE contends that the District Court erred in holding that the standard of civil liability—unlike the standard for criminal liability—"does not require proof that a defendant had any appreciation that its conduct was impermissible." Appellee Br. at 37-38.

This double-knowledge requirement simply does not fit into the DPPA's statutory scheme.[21] The provisions of §§ 2722(a) and

_____

(quoting Laborers' Int'l Union v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994)).

[20] To hold otherwise would be to permit any union, or indeed any law firm, to access the DMV information of individuals at nearly any large company. Such companies are often involved in, or at least susceptible to, litigation of some sort. If this legal exposure was the only criterion necessary to render an entity's activities investigations in anticipation of litigation, the DPPA's privacy protections would mean very little.

[21] In addition to our anaylsis set forth in the text, we concur with the District Court's analysis concerning the location of the adverb "knowingly" within § 2724(a). Restating its explanation, § 2724(a)'s first two clauses describe the act that subjects a defendant to civil liability (obtaining, disclosing, or using personal information from a motor vehicle record), while the third clause limits liability to acts done for "a purpose not permitted under this chapter." Pichler I, 228 F.R.D. at 241-42. "If Congress had

25

2724(a) that UNITE claims to be identical can be read consistently. Section 2722(a) by itself does not create civil or criminal liability. It merely describes what conduct is wrongful under the DPPA. Section 2724(a), in turn, provides the standard for civil liability. Section 2723 provides the standard for criminal fines.

Congress' structuring of the DPPA—specifically, the interplay amongst its recitation of unlawful acts, civil penalties, and criminal penalties—is not unique. For instance, 18 U.S.C. § 842(a), like 18 U.S.C. § 2722, provides that "[i]t shall be unlawful for any person" to commit certain acts or omissions violative of the Controlled Substances Act. Section 842(c)(2), like 18 U.S.C. § 2723(a), creates criminal liability for violating those acts or omissions "knowingly." Section 842(c)(1), like 18 U.S.C. § 2724(a), creates civil liability for violating those acts or omissions, but does not premise civil liability on knowing violations. In fact, as we recognized in United States v. Green Drugs, 905 F.2d 694 (3d Cir. 1990), the strict liability standard is applicable for civil violations of section 842(a).[22] Analyzing the statute, we noted this disparity in standards, observing that violation of 21 U.S.C. § 842(a) "subjects an offender to civil or penal penalties, depending on whether the act was committed knowingly." Id. at 695-96. We observed further that "Congress, therefore, plainly differentiated between civil and criminal violations of [§ 842(a)], implementing different standards of fault." Id. at 697. Similarly, here, we hold that Congress differentiated between a knowing acquisition, disclosure, or use to establish civil liability, and any knowing violation to establish liability for a criminal fine.

Moreover, UNITE's reading of the DPPA is incomprehensible given the statute's punitive damages provision. Section 2724, as stated earlier, provides a civil cause of action

___

intended for 'knowingly' to refer not only to the act element but also to the purpose element—so as to proscribe only those acts done for a purpose not 'knowingly' permitted—it would have been odd to locate the word 'knowingly'" so removed from the purpose element. Id. at 242.

[22] In 1998, 21 U.S.C. §§ 842(5) and (10) were amended to add the word "negligently."

against "a person who knowingly obtains, discloses or uses personal information . . . for a purpose not permitted" under the statute. 18 U.S.C. § 2724(a). The DPPA continues that while the "court may award" actual damages, it may award punitive damages only "upon proof of willful or reckless disregard of the law." 18 U.S.C. § 2724(b)(2). According to UNITE, however, there is no violation of the statute absent evidence "that a defendant appreciated the illegality of his conduct," Appellee Br. at 37-38, thus making every single violation one for which punitive damages would apply. UNITE tries to save this argument by noting that "liability for compensatory damages would be proper on proof that a party appreciated it was engaging in wrongful conduct, but punitive damages would be reserved for those instances where a party knew it was violating the law or recklessly disregarded its obligations under the law." Appellee Reply Br. at 21. We cannot conceive of what willful or reckless disregard for the DPPA could be other than where a "party appreciated it was engaging in wrongful conduct" under the DPPA.

Accordingly, we will affirm the judgment of the District Court on this issue.

VIII.

UNITE's final argument as cross-appellant addresses plaintiffs' burden to recover liquidated damages under the DPPA. According to UNITE, the District Court erroneously construed § 2724(b), permitting plaintiffs to recover liquidated damages without showing some measure of actual damages. We disagree.

UNITE begins its argument by noting—correctly—that we must focus upon the plain language of the statute and if the statute is unambiguous, our inquiry begins and ends with the statutory text. Appellee Br. at 48 (citing BedRoc Ltd., LLC. v.United States, 541 U.S. 176, 183 (2004)). We agree with UNITE that the language of § 2724(b) is unambiguous, but we disagree about its meaning.

As we understand the plain meaning of the provision, the two phrases therein grant, and then limit, the authority of the court in awarding damages. Simply put, the first phrase ("The court may

27

award -- actual damages") is a grant of authority to the court—it enables the court to award actual damages, however high they might be. The second phrase ("but not less than liquidated damages . . ."), then, limits that authority on the low end of the scale, creating a damage award floor. While the court may award actual damages, it may not grant an award "less than liquidated damages in the amount of $2,500." 18 U.S.C. § 2724(b)(1). But the first clause does not affect the baseline award of liquidated damages in the amount of $2,500 for any DPPA violation that the District Court chooses to compensate. In other words, the second phrase creates a base amount below which the court may not go, whether the plaintiff is able to prove actual damages or not.

Indeed, the Court of Appeals for the Eleventh Circuit, considering the identical issue now before us, arrived at the same conclusion as we reach here. See Kehoe v. Fidelity Fed. Bank & Trust, 421 F.3d 1209 (11th Cir. 2005). The court in Kehoe began its analysis by reviewing the text of § 2724 and determined that "[t]here is no language in sub-section (b)(1) that confines liquidated damages to people who suffered actual damages." Id. at 1213. Instead, the court held that the second phrase of § 2724(b)(1) is not dependent upon proof of actual damages, but rather that the two clauses are to be read in the disjunctive: a plaintiff "may receive the greater of his actual damages or $2,500.00." Id. The court concluded that "[h]aving considered the plain text of the DPPA's remedial provision . . . a plaintiff need not prove actual damages to recover liquidated damages." Id. at 1216.

The Supreme Court's opinion in Doe v. Chao, 540 U.S. 614 (2004), and the common law of privacy support this understanding of the plain language as well. In Doe, the Supreme Court considered the issue of whether the Privacy Act requires that plaintiffs prove actual damages to qualify to receive statutory damages. The Court ruled in the affirmative, but the difference between the Privacy Act and the DPPA, as well as the Court's broader analysis, actually support our holding to the contrary here.

Unlike the DPPA, the Privacy Act contains language providing that the defendant is liable for "actual damages sustained by the individual as a result of [certain agency conduct] . . . , but in

28

no case shall *a person entitled to recovery* receive less than the sum of $1,000." 5 U.S.C. § 552a(g)(4)(A) (emphasis added). Accordingly, "the simplest reading of that phrase looks back to the immediately preceding provision for recovering actual damages." Doe, 540 U.S. at 620. Only a "person entitled to recovery" of actual damages can qualify for a statutory damage award. The DPPA, however, contains no such "critical limiting" language, id. at 626, suggesting that a person need not prove actual damages to receive liquidated damages.

Further support for our construction of § 2724(b)(1) comes from the common law of privacy. As the Court in Doe pointed out, unlike common law negligence actions, the common law provided privacy tort victims with a monetary award calculated without proving actual damages. See Doe, 540 U.S. at 621 n.3 (quoting 4 Restatement of Torts § 867 cmt. d (1939)) (noting that damages are available for privacy tort victims "in the same way in which general damages are given for defamation," without proof of "pecuniary loss [or] physical harm"); Parks v. Internal Revenue Serv., 618 F.2d 677, 683 (10th Cir. 1980) (observing that the "common law tort of invasion" seeks to remedy "personal wrongs which result in injury to plaintiffs' feelings and are actionable even though the plaintiff suffered no pecuniary loss nor physical harm"); Nolley v. County of Erie, 802 F. Supp. 898, 904 (W.D.N.Y. 1992); Bolduc v. Bailey, 586 F. Supp. 896, 902 (D. Colo. 1984). Courts permit recovery in privacy cases without proving actual damages because it is difficult to prove damages in such cases. See Nolley, 802 F. Supp. at 904 (stating that although violation of the right to privacy "is virtually certain to cause some injury . . . the type of injury [] is very difficult to prove"); Fairfield v. Am. Photocopy Equip. Co., 291 P.2d 194, 198 (Cal. Ct. App. 1955) ("The fact that damages resulting from an invasion of the right to privacy cannot be measured by a pecuniary standard is not a bar to recovery.").[23] As

_____

[23] While the majority in Doe deviated from the common law understanding just explained, it did so based on various facts and circumstances not present in this case. Besides the "critical limiting" language of the Privacy Act, the "drafting history show[s] that Congress cut out the very language in the bill that would have authorized any presumed damages." Doe, 540 U.S. at 622. In

29

the court in <u>Kehoe</u> correctly concluded:

> Damages for a violation of an individual's privacy are a quintessential example of damages that are uncertain and possibly unmeasurable. Since liquidated damages are an appropriate substitute for the potentially uncertain and unmeasurable actual damages of a privacy violation, it follows that proof of actual damages is not necessary for an award of liquidated damages.

421 F.3d at 1213.

Finally, as discussed above in a different context, <u>see</u> section V, <u>supra</u>, the inclusion of the phrase "liquidated damages" supports the conclusion that the plain language of the DPPA aims to compensate not just those violations that can be shown to have caused actual damages. Liquidated damages have long been used as a substitute for actual damages in situations where "damages are uncertain in nature or amount or are unmeasurable." <u>Rex Trailer Co. v. United States</u>, 350 U.S. 148, 153 (1956). Further, we have just observed that the damages flowing from privacy violations have historically been considered "quintessential example[s] of damages that are uncertain and possibly unmeasurable." <u>Kehoe</u>, 421 F.3d at 1213. We believe it would make little sense, as a matter of statutory construction, for Congress to have inserted the phrase "liquidated damages" into § 2724(b)(1) if the only compensable violations of the DPPA were those for which the damages could be calculated precisely. Indeed, such an interpretation would violate our duty to give effect to each word of the statute. <u>See</u> <u>Pa. v. United States Dep't of Heath & Human Servs.</u>, 928 F.2d 1378, 1385 (3d Cir. 1991).

---

addition, as the Privacy Act involved a waiver of sovereign immunity, its construction followed the principle that "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." <u>Lehman v. Nakshian</u>, 453 U.S. 156, 161 (1981) (citation omitted); <u>see</u> <u>United States v. Williams</u>, 514 U.S. 527, 531 (1995).

The plain language of the DPPA, Supreme Court and other precedent, and the common law of privacy all support construing § 2724(b) so as not to require actual damages to recover liquidated damages. Accordingly, we will affirm the District Court's judgment on this issue.

## IX.

For the foregoing reasons, we will affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

SLOVITER, <u>Circuit Judge</u>, <u>dissenting</u>.

Congress took an important step in protecting the privacy of drivers when it enacted the Driver's Privacy Protection Act ("DPPA" or "Act") in 1994. That Act prohibits the disclosure and resale of the personal information, defined as, inter alia, the name, address, telephone number and social security number, that a prospective licensee must disclose to the state motor vehicle department in order to secure a driver's license unless the disclosure and/or use falls within one of the fourteen enumerated statutory exceptions. <u>See</u> 18 U.S.C. §§ 2721-2725.

The impetus for the Act is clear from the legislative history. A television actress in California who had an unlisted home number and address "was shot to death by an obsessed fan who obtained her name and address through the DMV." <u>See</u> 140 Cong. Rec. 7,924-25 (1994). In Tempe, Arizona, "a woman was murdered by a man who had obtained her home address from that State's DMV." 139 Cong. Rec. 29,466 (1993). The Senate debate focused on the need to protect the privacy of persons from stalkers and potential criminals. <u>See</u> <u>id.</u> at 29,469. At that time, personal information was easily available from 34 states' DMVs. <u>Id.</u> at 29,466.

Interestingly, although the debates in the House of Representatives and Senate were devoted to privacy issues, the commentary following the passage of the DPPA focused on the 10th and 11th Amendments and what many commentators viewed as the Act's clash with principles of federalism. The expressed concern was that the federal government was mandating certain actions by the states. <u>See</u> <u>Condon v. Reno</u>, 155 F.3d 453, 456 (4th Cir. 1998) (holding that "Congress lacked the authority to enact the DPPA under either the Commerce Clause or Section 5 of the Fourteenth Amendment"), <u>rev'd</u> 528 U.S. 141 (2000). The Supreme Court's unanimous decision in <u>Reno v. Condon</u>, 528 U.S. 141 (2000), which held that in enacting the DPPA Congress did not run afoul of federalism principles and sustained the DPPA under Congress' authority to regulate interstate commerce put an end to that debate. Because the Court limited its discussion to the federalism issue, it did not discuss either the scope of the privacy

32

interest to which the DPPA is directed or any of the details of the Act to which the majority directs its opinion.

The holding of the majority with which I disagree is confined to its agreement with the District Court that even if UNITE obtained and used driver information for one of the purposes expressly permitted by the DPPA, it violated the statute if it also had a purpose not expressly permitted. As the majority recognizes, UNITE argued that "a major component of the campaign to organize and unionize Cintas workers was finding potential legal claims against Cintas." Maj. Typescript Op. at 3. The statute expressly exempts from its prohibitions "use in connection with any civil criminal, administrative, or arbitral proceeding in our Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State or local court." 18 U.S.C. § 2721(b)(4) (emphasis added). The majority does not suggest that it doubts that UNITE did in fact have this objective. In its brief, UNITE lists various legal actions that it and/or Cintas employees filed against Cintas, including a class action alleging FLSA violations concerning drivers' overtime pay, an action in California for violations of living wage ordinances, a complaint with the EEOC alleging Cintas discriminated on the basis of race, color, sex, and national origin and subsequently a class action in federal court in which the EEOC intervened as a plaintiff. Appellee's Br. at 13-14. It also states that "[d]ozens of additional lawsuits and administrative actions were commenced before the EEOC, OSHA, NLRB, and other agencies." Id. at 14.

The District Court held, and the majority agrees, that because UNITE conceded that it also accessed the motor vehicle records for the purpose of organizing workers, and union organizing is not listed a permissible purpose, the use of names and addresses of Cintas employees for that purpose violated the DPPA as a matter of law. Pichler v. UNITE, 446 F.Supp.2d 353, 368 (E.D. Pa. 2006). I disagree.

In the first place, there is ample basis in the record to

33

substantiate UNITE's assertion that it had the purpose of investigating legal claims against Cintas. Indeed, the District Court's opinion notes that UNITE prepared a 132-page "Legal Training Laundry Campaign" document that its attorneys and outside counsel used to train the twelve UNITE members who were the lead organizers for the regions where UNITE would kick off its campaign. Pichler, 446 F.Supp.2d at 357. The training covered such topics as the Fair Labor Standards Act, the Family Medical Leave Act, various types of discrimination, unfair labor practices, and workers' compensation. Id.

That such training would be useful can be gleaned from the statement in the District Court opinion that many employees working at the 350 Cintas locations are either female, black, or Hispanic. Id. at 355. Although neither the District Court nor the majority has so stated, I assume that not many of the 28,000 Cintas employees are well informed about their rights and UNITE may very well have a basis for instituting legal or administrative actions on behalf of the Cintas employees at issue in this case as it has done in other locations.

The District Court's view of the "investigation in anticipation of litigation" clause in § 2721(b)(4) was a narrow one. It asserted that "the Unions must prove that (1) they undertook an actual investigation; (2) at the time of the investigation, litigation appeared likely; and (3) the protected information obtained during the investigation would be of 'use' in the litigation," which "implies a reasonable likelihood that the decision maker would find the information useful in the course of the proceeding." Pichler v. UNITE, 339 F.Supp.2d 665, 668 (E.D. Pa. 2004). The Court concluded that UNITE was "finding" claims, rather than investigating them, and that litigation was not "likely" where only thirty-one of 1758 to 2005 putative class members' information had led or was leading to litigation. Pichler, 446 F.Supp.2d at 369.

A recent decision of the Court of Appeals for the Eleventh Circuit offers a starkly different interpretation of § 2721(b)(4). Honing in on the clause allowing "investigation in anticipation of litigation," that court stated that "even if the accumulation of potential witnesses related, in part, to certain cases

not yet filed, we do not see how pre-suit investigation can be considered per se inapplicable to the litigation clause." Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, and Stevens, P.A., 525 F.3d 1107, 1115 n.5 (11th Cir. 2008). The court concluded that a law firm's retrieval of 284,000 motor vehicle records, id. at 1109, "used to send one-thousand 'Custom and Practice' letters, which aimed at obtaining evidence showing a custom or practice of deceptive acts engaged in by [car] dealerships," id. at 1114, was a permissible use of the information in those records. Id. at 1115.

I would adopt the Eleventh Circuit's interpretation of § 2721(b)(4). The provision is written broadly. It allows the use of personal information from motor vehicle records "in connection with" a wide range of litigation activities, including "the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders . . . ." 18 U.S.C. § 2721(b)(4). UNITE produced evidence that because it was aware of litigation against Cintas, it sought and obtained evidence of related legal violations during its home visits, and that it used that information to bring a considerable number of allegations before state, federal, and administrative adjudicatory bodies. See supra at pp. 4-5. In light of this evidence, there can be little doubt that at least one of UNITE's purposes for using the restricted information was in connection with investigation in anticipation of litigation.

Furthermore, it is important to note that there is nothing illegal about efforts to organize a union. It is one of the activities protected by our labor laws. See National Labor Relations Act § 7, 29 U.S.C. § 157 ("Employees shall have the right to . . . form, join, or assist labor organizations . . . ."). There is no indication that the need to obtain names and addresses of employees for the purpose of unionization was ever brought to Congress' attention when it drafted the DPPA. We cannot speculate whether it would have added this as one of the enumerated permissible uses had the labor unions expressed their views. We do know, from the vignette included in the majority opinion, that the UNITE organizers did not engage in harassing the employees whose addresses they had obtained. The majority states

35

that when two women rang the doorbell of Kevin Quinn and told him they were organizing, he told them he was not interested and they departed. Although they did nothing more offensive than ring his doorbell, he became a named plaintiff and, under the opinion of the District Court affirmed by the majority, will be entitled to $2,500. UNITE also calls to our attention record evidence that all union representatives who made home visits in connection with the campaign acted politely and left without conversation when asked to do so. Appellee's Br. at 15-16.

The majority cites no legislative history to support its conclusion that the presence of one unlisted purpose for obtaining the motor vehicle information overrides or cancels a listed purpose. When such cases are presented, I would adopt the approach courts have historically used in situations where there are multiple purposes and have the fact-finder determine which is the primary purpose and whether that purpose was permitted under § 2721(b). Cf. Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (noting that Title VII requires plaintiff to prove that "race, color, religion, sex, or national origin was a motivating factor" for the challenged employment practice); Comm'r of Internal Revenue v. Groetzinger, 480 U.S. 23, 35 (1987) (whether income arises from a business or trade under the Internal Revenue Code requires determination that "the taxpayer's primary purpose for engaging in the activity must be for income or profit").

I recognize the significance of the majority's footnote stating that UNITE waived any argument that we should analyze whether its purpose was primary or secondary because it failed to raise the argument in the District Court or in any of the briefs filed in this court. I do not minimize the force of that argument, but note that because our interpretation of this statute will set the boundaries of civil liability under the DPPA in this circuit, I would apply our precedent and exercise our discretion to consider the argument notwithstanding the waiver. See Loretangeli v. Critelli, 853 F.2d 186, 189 n.5 (3d Cir. 1988) ("This court may consider a pure question of law even if not raised below where refusal to reach the issue would result in a miscarriage of justice or where the issue's resolution is of public importance.").

In summary, I would reverse the District Court's grant of summary judgment for plaintiffs on liability and would remand so that a jury could decide whether UNITE's primary purpose in obtaining and using the information gleaned from motor vehicle records was to receive information from Cintas employees about potential legal violations, an expressly protected activity.