**SELECTIVE WAY INSURANCE COMPANY**

v.

**TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA.**

**Civil Action No. 09–1670.**

United States District Court,
E.D. Pennsylvania.

July 8, 2010.

Andrew G. Cassidy, Donnelly & Associates P.C., Conshohocken, PA, for Plaintiff.

## *MEMORANDUM*

McLAUGHLIN, District Judge.

This declaratory judgment action involves an insurance coverage dispute between the plaintiff, Selective Way Insurance Company ("Selective Way") and the defendant, Travelers Property and Casualty Company of America ("Travelers"), after an automobile accident in Tunkhannock, Pennsylvania that occurred on October 3, 2005. The accident gave rise to a

state civil action,[1] and Selective Way, the insurer for the named defendants, settled the lawsuit for $14.25 million.

Selective Way filed the instant action because it claims that Travelers had an obligation to provide a defense and indemnity to two defendants, Keith Stalker and Stafursky Paving, Inc. ("Stafursky Paving"). Selective Way and Travelers both move for summary judgment. For the reasons stated below, the Court will grant Travelers' motion.

I. *Summary Judgment Record*

Stafursky Paving is a Pennsylvania corporation that primarily provides excavation, construction and paving services. It also provides hauling services to third-party companies. David Stafursky is the President of Stafursky Paving. Dep. of Keith Stalker 10:1–18 ("Stalker Dep."), Ex. G to Pl.'s M.; Dep. of David Stafursky 5:3–9 ("Stafursky Dep."), Ex. H. to Pl.'s M.[2]

At the time of the accident, Stafursky Paving had approximately ten tri-axle dump trucks, which were kept at its business address in Archibald, Pennsylvania. The trucks were licensed in the company's name, and they were maintained and owned by Stafursky Paving. Stalker Dep. 13:1–24; Stafursky Dep. 10:13–18.

At the time of the accident, States Aggregate ("S.A.")[3] was a business that produced crushed stone and asphalt materials for roads. Since approximately some time in the 1980s, S.A. would occasionally contact Stafursky Paving to haul materials. To schedule a truck for hauling, Vernon Tompkins, an employee of S.A., would contact Stafursky Paving by telephone and request a dump truck for a specific day. S.A. would then have the truck and driver for that day for as long as necessary. Dep. of Vernon Tompkins 9:5–9, 10:23–11:24, 8:5–14, 13:19–25, 15:24–17:6 ("Tompkins Dep."), Exhibit I to Pl.'s M.

The Friday before October 3, 2005, Mr. Stafursky spoke with Mr. Tompkins regarding hauling for an ongoing paving project. The exchange was an oral exchange, and there is no written contract memorializing the terms of the agreement. Stafursky Dep. 7:10–24, 12:3–19; Tompkins Dep. 10:23–11:24.

Pursuant to the conversation with Mr. Tompkins, Mr. Stafursky assigned Keith Stalker, a Stafursky Paving employee, to report to the S.A. blacktop plant in Clifford, Pennsylvania on October 3, 2005, at 7 a.m. Mr. Stafursky also determined which Stafursky Paving dump truck Mr. Stalker would use. S.A. never chose the truck or the driver for its hauling projects, but, theoretically, S.A. could call Stafursky Paving if it sent a truck that was not a dump truck or sent a driver who did not perform properly. Such problems, however, had never occurred and did not occur on the day of the accident. Stafursky Dep. 7:3–8:4; Stalker Dep. 22:7–9, 19:18–20:6, 23:10–12; Tompkins Dep. 25:18–30:14.

Mr. Stalker determined his own route to drive to the S.A. plant on October 3, 2005. When Mr. Stalker arrived at the plant

---

**1.** The state action was styled *Tracy Irish and John Irish v. Dempsey Uniform and Linen Supply, Inc., James Fox, Stafursky Paving Co., and Keith Stalker,* Docket No. 314–206, and it was initiated in Lackawanna County Court of Common Pleas in Pennsylvania.

**2.** The Court cites to the parties' exhibits when referencing the summary judgment record.

The defendant also included the depositions of Mr. Stafursky and Mr. Stalker in its motion for summary judgment, as exhibits E and F, respectively. These deposition transcripts are the same as those attached to the plaintiff's motion referenced above.

**3.** States Aggregate is currently known as Eastern Industries.

around 7 a.m., an S.A. employee told him when to load and where he was going. After Mr. Stalker's truck was loaded with asphalt, he received a bill of lading with the delivery address. Mr. Stalker was to deliver the material to a resurfacing project on State Road 29/309. Stalker Dep. 20:17–21:5, 23:16–25:14; Tompkins Dep. 32:21–25, 33:14–23.

Mr. Stalker left to deliver the materials around 8:30 a.m. When he arrived at the delivery location, he provided an S.A. employee with the bill of lading for signing. He then waited his turn to dump the materials. Any driver, including S.A.'s own employees who performed hauling, would follow these procedures. Stalker Dep. 25:8–10, 26:3–9, 28:11–20; Tompkins Dep. 33:1–13, 59:20–60:9.

After Mr. Stalker unloaded his truck, he returned to S.A. to obtain another load to be hauled to the same location. After delivering the second load, he returned to S.A. to obtain a third load. Mr. Stalker deposited the third load, and he left the job site at 2:55 p.m., having completed the hauling for S.A. A truck driver would know that he was done hauling if he was not told to get another load; he would then be signed out. Stalker Dep. 26:13–29:23, 33:5–24, 34:6–9; Tompkins Dep. 25:14–17.

Mr. Stalker intended to drive back to Stafursky Paving in Archibald, Pennsylvania. In all of his driving, to the S.A. plant, to and from the hauling points, and back to Stafursky Paving, Mr. Stalker chose his own route. Mr. Tompkins explained in his deposition that S.A., as a matter of business practice, did not designate a driver's route for hauling because the drivers know the particular weight limit restrictions of each road and bridge. After repeated questions asking whether, theoretically, Mr. Tompkins could tell a driver to take a particular route, Mr. Tompkins responded, "Theoretically I could tell the driver any-

thing I wanted to." Stalker Dep. 34:14–19, 25:25–26:2, 27:11–12, 33:1–4, 35:6–11; Tompkins Dep. 18:23–21:25.

On his way back from the S.A. worksite to the Stafursky Paving plant, prior to arriving there, Mr. Stalker's truck was involved in an accident. Stalker Dep. 35:20–22.

Mr. Stalker did not perform any hauling for any other company other than S.A. that day. Mr. Stalker did not perform any other duties for Stafursky Paving that day. Because of the agreement with S.A., Stafursky Paving would not have been able to lease the truck that Mr. Stalker drove or Mr. Stalker himself to any other person or company that day. At the same time, Mr. Stalker was is Stafursky Paving's dispatch, in that he could communicate with the company through radio. If Stafursky Paving had another job for Mr. Stalker after he completed the hauling for S.A., then it could have directed Mr. Stalker to the new job, and Mr. Stalker would have complied. Stalker Dep. 40:7–13, 38:16–39:1; Stafursky Dep. 16:13–18, 13:22–14:13, 10:4–12.

S.A. paid Stafursky Paving $6.25 per ton of material hauled. This amount accounted for all of Stafursky Paving's overhead costs for the project, including the costs of paying Mr. Stalker. Stafursky Paving provided Mr. Stalker with a weekly paycheck, from which it deducted taxes. Mr. Stalker was never paid directly by S.A. for his services. Stalker Dep. 37:11–21, 22:16–23:3, 35:17–19; Stafursky Dep. 8:20–9:1, 13:11–16, 19:7–18.

In full force and effect at the time of the accident was a commercial automobile policy issued by Travelers to the Estate of Donald B. Stabler, Q–Tip Trust and/or Stabler Companies ("Travelers policy"). Also in effect was a "Broadened Named Insured Endorsement," which modified "insured" in the Travelers policy to include

"any organization, other than a partnership or joint venture, over which you maintain ownership or majority interest on the effective date of the policy." Travelers Policy, Ex. C to Pl.'s M.; Traveler's Endorsement, Ex. D to Pl.'s M.

It is undisputed that, as of the effective date of the policy, Stabler Companies maintained an ownership interest in S.A. It is also undisputed that S.A. qualified as an insured under the Travelers policy, and that S.A. was an insured on the date of the automobile accident. Pl.'s Request for Admissions, Ex. E to Pl.'s M.

With respect to business auto coverage, the Travelers policy provides:

**A.  Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which the insurance applies, caused by an "accident" and resulting from an ownership, maintenance or use of a covered "auto".

Travelers Policy, Business Auto Coverage Form at 2, Ex. F to Pl.'s M. The policy further provides:

**1.  Who Is An Insured**

The following are "insureds":

a.   You for any covered "auto".

b.   Anyone else while using with your permission a covered "auto" you own, hire or borrow . . .

   . . .

c.   Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

Ex. F at 2.

**II.  *Analysis***

Selective Way argues that both Mr. Stalker and Stafursky Paving are insureds under the Travelers policy. First, it asserts that Mr. Stalker is an insured pursuant to the terms of the policy because S.A. "hired" the truck that Mr. Stalker used at the time of the accident, and individuals who operate "hired autos" are insureds. It argues that the term "hire" does not include an element of control, but that even if the Court finds "hire" to contain this element, then S.A. controlled and had the right to control both Mr. Stalker and the Stafursky Paving dump truck.

Second, it asserts that Mr. Stalker is an insured under the policy pursuant to Pennsylvania's "borrowed servant doctrine," where an employee of one company becomes an employee of a second company if the second company controlled or had a right to control the employee. It argues that because S.A. had the right to control Mr. Stalker and did control him, Mr. Stalker is an insured. It asserts that if Stalker is an insured under either rationale, then Stafursky Paving is also an insured because the policy covers anyone liable for the conduct of an insured.

Travelers argues both in its motion for summary judgment and its opposition to the plaintiff's motion for summary judgment that Mr. Stalker did not operate a "hired auto." It asserts that courts evaluate whether an auto is "hired" based on the degree of control a company exerts over the driver and vehicle. Because S.A. did not have control over Mr. Stalker or the Stafursky Paving dump truck, Travelers is not liable for any insurance coverage. Travelers also argues that, if the Court finds coverage under the Travelers policy, the policy's "other insurance" clause bars any collection or indemnification.[4]

---

**4.**  Travelers asserts its "other insurance" argument in its reply to its motion for summary judgment. Selective Way moved to file a surreply and argues in the brief attached to its

Under Rule 56 of the Federal Rules of Civil Procedure, a party moving for summary judgment must show that there is no genuine issue as to any material fact and that judgment is appropriate as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once a properly supported motion for summary judgment is made, the burden then shifts to the nonmoving party, who must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■■■ The burdens of proof do not change in cases where a court is considering cross-motions for summary judgment. *Peters Twp. Sch. Dist. v. Hartford Accident & Indem. Co.,* 833 F.2d 32, 34 (3d Cir.1987). On cross-motions for summary judgment, the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. *Pichler v. UNITE,* 542 F.3d 380, 386 (3d Cir.2008).

A. *Interpretation of the Traveler's Insurance Policy*

■■■ Pursuant to the Travelers policy, an insured is "anyone ... while using with your permission a covered 'auto' you own, hire, or borrow." Because the Travelers

policy does not define the term "hire," the Court must interpret its meaning.

■■■ Under Pennsylvania law,[5] an insurance policy must be read as a whole and construed according to the plain meaning of its terms. *C.H. Heist Caribe Corp. v. Am. Home Assurance Co.,* 640 F.2d 479, 481 (3d Cir.1981). Words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense, and courts may inform their understanding of such words by consulting a dictionary. *Madison Constr. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 108 (1999). Ambiguous terms in a contract are to be construed in favor of the insured and against the insurer. *Bateman v. Motorists Mut. Ins. Co.,* 527 Pa. 241, 590 A.2d 281, 283 (1991).[6] Courts, however, should not read ambiguity into contracts. *Madison Constr. Co.,* 735 A.2d at 106 ("We will not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity."). Contractual language is ambiguous only "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Co.,* 513 Pa. 192, 519 A.2d 385, 390 (1986).

The plaintiff asserts that the Court should look to dictionaries to determine the meaning of "hire," and that none of the definitions contain explicitly the word "control." It also argues that the term "hire" is ambiguous because it is not defined in the Travelers policy. It should be construed against Travelers, the drafter,

---

motion that the "other insurance" clause does not alter Travelers' responsibilities of payment to Selective Way. Because the Court finds that Mr. Stalker and Stafursky Paving are not insureds under the Traveler's policy, it does not reach this issue.

**5.** Both parties submit that Pennsylvania law controls this action.

**6.** The presumption against the insurer applies even when the parties in an action are two insurance companies. *Pa. Nat'l Mut. Cas. Ins. Co. v. Traveler's Ins. Co.,* 405 Pa.Super. 149, 592 A.2d 51, 53–54 (1991).

and not found to contain an element of control.

The plaintiff's arguments fail. First, although dictionaries may not use the word "control" when defining "hire," and Pennsylvania courts have provided little guidance in interpreting the term, the Court finds that the term "hire" contains an element of control. According to the Oxford English Dictionary, the term "hire" means: "To procure the temporary use of (any thing) for stipulated payment." Oxford English Dictionary (2d ed. 1989). The Merriam–Webster Dictionary provides: "To engage the temporary use of for a fixed sum." Webster's Third New Int'l Dictionary (1997). To use something requires a degree of control. As explained in a treatise on insurance, "[T]he key inquiry regarding whether an automobile will fall within the hired automobiles provision of the policy is whether the insured exercised dominion, control or the right to direct the use of the vehicle." Lee R. Russ & Thomas F. Segalla, COUCH ON INSURANCE § 118.46, at 118–74 (3d ed. 1997) (*quoted in* Holmes v. Brethren Mut. Ins. Co., 868 A.2d 155, 158 (D.C.Ct.App. 2005)).

The majority of courts that apply the plain meaning of "hire" when interpreting policies like the one at issue have found the term to contain an element of control. E.g., U.S. Fid. & Guar. Co. v. Heritage Mut. Ins. Co., 230 F.3d 331, 333–35 (7th Cir.2000);[7] (evaluating "hired auto" under Indiana law based on plain meaning of term and amount of control when one company was hauling materials for another company); Chicago Ins. Co. v. Farm Bureau Mut. Ins. Co., 929 F.2d 372, 374–75 (8th Cir.1991) (evaluating control to deter-

mine whether company was an independent contractor or "hired auto"); Wolverine Ins. Co. v. State Auto. Mut. Ins. Co., 415 F.2d 1182, 1184 (6th Cir.1969) ("The right to control of equipment is generally regarded as the critical distinction between the 'hired automobile' and the 'nonowned automobile' for insurance contract purposes."); Earth Tech, Inc. v. U.S. Fire Ins. Co., 407 F.Supp.2d 763, 771–73 (E.D.Va. 2006) (evaluating "hired auto" under Virginia law based on degree of control); Occidental Fire & Cas. Co. v. Westport Ins. Corp., No. 02–8923, 2004 WL 2028616, at *5–9 (E.D.Pa. Sept. 10, 2004) (evaluating "hired auto" under Pennsylvania law based on dictionary definition and amount of control when one company subcontracted with another company for hauling).

The plaintiff cites to only one case, Pawtucket Mutual Insurance Company v. Hartford Insurance Company, 147 N.H. 369, 787 A.2d 870 (2001), where a court did not consider control when determining whether a car was a "hired auto" for insurance policy purposes. Pawtucket, however, did not involve a hauling scenario, unlike the above-referenced cases. Further, courts note that Pawtucket is known for its "distinctly minority view" with respect to this issue. Holmes, 868 A.2d at 158 n. 3; see Earth Tech, 407 F.Supp.2d at 771–72 & n. 13.

■■ Second, the Court does not find the term "hire" to be ambiguous, such that it should be construed against Travelers. A term is not ambiguous under Pennsylvania law simply because it is undefined; it is ambiguous when it is susceptible to two different meanings. Hutchison, 519 A.2d at 390. Courts should not distort the meaning of a word to find an ambiguity.

---

**7.** Although Indiana, unlike Pennsylvania, law does not require courts to construe ambiguous terms against an insurer when the parties in a matter are two insurance companies, the

court in *U.S. Fidelity* did not rely on this aspect of Indiana law in reaching its decision because it found the term "hire" unambiguous. *U.S. Fid.,* 230 F.3d at 333.

*Madison Constr. Co.*, 735 A.2d at 106. Further, a finding of ambiguity would not require the Court to ignore the element of control because courts have still considered the degree of control upon holding that the term "hire" is ambiguous. *E.g., Kresse v. Home Ins. Co.*, 765 F.2d 753, 755–56 (8th Cir.1985) (finding "hire" ambiguous, then evaluating term based on degree of control); *Toops v. Gulf Coast Marine Inc.*, 72 F.3d 483, 486–87 (5th Cir. 1996) (holding contract should be construed against insurer and evaluating "hired auto" through degree of control).

### B. Whether S.A. "Hired" the Stafursky Paving Truck

■ Courts evaluating "hired auto" clauses in the hauling context look to a variety of factors to determine whether a company in S.A.'s position had control, such that the auto was "hired." They consider the degree of control exerted over the vehicle, driver, and route, and note that minimal levels of control do not render an auto "hired."

In *United States Fidelity & Guaranty Company v. Heritage Mutual Insurance Company*, 230 F.3d 331, the Court of Appeals for the Seventh Circuit evaluated whether Irving Materials, Inc. ("IMI") hired a truck owned by V & S Transport, Inc. ("V & S") after an employee of V & S was involved in an accident while hauling materials for IMI. The insurance companies for IMI and V & S filed cross-motions for summary judgment, and the Court of Appeals affirmed the district court's finding that the truck was not a "hired auto" because: (1) V & S maintained its trucks and provided gas for them, (2) V & S paid the drivers and provided their benefits, and (3) IMI did not dictate the routes the drivers took. Although IMI directed the driver to particular locations, it could tell V & S not to send a particular driver, and the driver worked for as long as IMI had loads, the court found this evidence of control insufficient to make the truck a "hired auto."

The Court of Appeals for the Eighth Circuit evaluated these factors in *Kresse v. Home Insurance Company*, 765 F.2d 753, to reach the opposite result. Clarence Kresse's driver was involved in an accident while hauling for Cass County, and Mr. Kresse's insurance company sought a declaration of insurance coverage. The Court of Appeals determined that there were genuine issues of material fact as to whether Cass County "hired" the auto involved in the accident because: (1) the parties had a written contract that referred to the trucks as "hired trucks"; (2) the county determined the route to be used, and it could dismiss drivers who deviated from it; (3) the county determined specific hours of operation; and (4) there was evidence that the county hired specific trucks.

One court in this district evaluated a "hired auto" clause in an insurance policy under Pennsylvania law and found these same factors relevant. In *Occidental Fire and Casualty Company v. Westport Insurance Company*, 2004 WL 2028616, B.K. Leasing Company, Inc. ("B.K.") had a verbal contract with F.O. Transport, Inc. ("F.O.T.") to transport cargo when B.K. did not have enough equipment or personnel to transport the cargo itself.[8] An

---

**8.** *Occidental* provided a slightly different fact pattern than the present matter. It involved a company with goods that hired a hauling company that subcontracted with another hauling company whose driver caused an accident, resulting in an insurance dispute between the two hauling companies. The present matter, however, involves S.A., a company with goods, that used a hauling company, Stafursky Paving, whose driver caused an accident. The Court finds this distinction immaterial. It did not have a bearing on the

F.O.T. driver was involved in an accident while hauling for B.K., and the insurance companies sought declarations of their coverage responsibilities. The court held that B.K. did not "hire" F.O.T. because: (1) B.K. did not determine the route that F.O.T. drivers took when hauling, (2) B.K. did not assign the drivers or tell the drivers how to maintain the trucks, and (3) B.K. did not choose a specific truck to be used. Although B.K. exerted limited control, in that it could instruct F.O.T. to not use certain drivers, it determined the number of loads transported, and it told F.O.T. where and when to load, this control was insufficient to demonstrate that B.K. hired the trucks. *See also Chicago Ins. Co.*, 929 F.2d at 374 (evaluating same factors); *Earth Tech*, 407 F.Supp.2d at 771–73 (same).

Upon consideration of the factors used by courts to determine whether an auto is "hired," the Court finds that the Stafursky Paving vehicle was not a "hired auto" for purposes of the Travelers policy.

### 1. *Vehicle*

It is undisputed that Stafursky Paving maintained all of the vehicles used for hauling. The vehicles were licensed in its name, and the company owned them. It is also undisputed that Stafursky Paving assigned the trucks to be used for hauling, and that Mr. Stafursky chose the truck for the S.A. project.

The plaintiff argues that S.A. had control over the truck because if Stafursky Paving did not send a dump truck, S.A. could get a replacement. Such a fact does not demonstrate control over the truck, or demonstrate that S.A. had the right to choose a specific dump truck for its hauling needs. *E.g., Kresse*, 765 F.2d at 756

(finding that choosing a specific dump truck to be used for the entire hauling season as evidence of control); *Earth Tech*, 407 F.Supp.2d at 773 (finding that choosing the type of truck, but not a specific truck within that type not an indicia of control).

### 2. *Driver*

Analysis of the control over the driver also demonstrates that S.A. did not "hire" the dump truck. It is undisputed that Mr. Stafursky chose which driver would perform a specific hauling project, and that Mr. Stafursky chose Mr. Stalker to perform for S.A. Also, Mr. Stalker was employed by Stafursky Paving at all times. He received a weekly pay check from Stafursky Paving from which taxes were deducted, and he was never paid by S.A.

The plaintiff argues that S.A. could exert control over Mr. Stalker because Mr. Stalker could not abandon the S.A. project while he was hauling, demonstrating that S.A. had exclusive control over him. Also, hypothetically, S.A. could tell Stafursky Paving that it did not like a driver who did not perform properly, and S.A. "paid" Mr. Stalker to the extent that the cost per ton of hauling included the cost of the driver.

These points are uncompelling. First, Mr. Stalker was under Stafursky Paving's dispatch during the entire hauling project, and it could have sent Mr. Stalker to a different hauling job once the S.A. job was complete. Second, courts have found that the ability to dismiss or the actual dismissal of drivers is insufficient to demonstrate control. *E.g., U.S. Fid.*, 230 F.3d at 333, 335; *Chicago Ins. Co.*, 929 F.2d at 374; *Occidental*, 2004 WL 2028616, at *7. Third, the payment per ton for the hauling included all of Stafursky Paving's overhead

---

holding of *Occidental*, and no courts have found the distinction meaningful. *E.g., U.S. Fid.*, 230 F.3d at 334 (citing to subcontractor

case even though fact pattern at issue did not involve subcontractors).

costs, and not just the costs of paying Mr. Stalker.

The plaintiff also argues that S.A. exerted control over Mr. Stalker because S.A. employees told Mr. Stalker where and when to load and unload the cargo, and it provided Mr. Stalker with a bill of lading to be handed over upon arrival at the dump site. S.A. employees who provided hauling for S.A. would also follow these procedures, indicating that S.A. exerted the same degree of control over Mr. Stalker as it did over its own employees.

Although such facts may be an indication of minimal control, they are insufficient to render the truck a "hired auto." S.A. did not tell Mr. Stalker how to operate his vehicle, nor did it provide specific instructions for how to load and unload. S.A. was only concerned with the result of the transportation from point A to Point B, and it gave minimal direction to Mr. Stalker for completing this task. *See, e.g., Toops,* 72 F.3d at 487; *Earth Tech,* 407 F.Supp.2d at 773; *Occidental,* 2004 WL 2028616, at *7.

Further, although S.A. employees hauling for S.A. would perform the same procedures, in the case of an S.A. employee, other factors reflecting control, which are absent here, would be present. In such a scenario, the employee would use a truck that S.A. owned, maintained, and licensed; he would receive a paycheck from S.A.; and he would remain in S.A.'s dispatch.

### 3. *Route*

Mr. Stalker stated that he chose all of his driving routes on the day of the accident: he chose his route to the S.A. plant, to and from the plant and the depositing location, and back from the depositing location to Stafursky Paving. Mr. Tompkins explained that he would never tell a driver what route to use for hauling because the drivers "know what roads, they know the bridges, they know the weight limit that I don't keep track of." Tompkins Dep. 19:13–15.

The plaintiff claims that S.A. controlled the route because, during a line of questioning asking whether S.A. could theoretically tell a driver what route to take, where Mr. Tompkins continued to explain that he would not dictate this aspect of hauling, Mr. Tompkins eventually stated, "Theoretically, I could tell the driver anything I wanted to." The plaintiff cites to this statement for the propositions that "if [S.A.] directed a driver to take a particular route, the driver would be required to take that route," and that S.A. "retained the right to control virtually every aspect of a hired truck and driver." Pl.'s Opp. 7; *see also* Pl.'s Opp. 18–20.

The record does not support the plaintiff's claim, and no reasonable jury could interpret Mr. Tompkins's statement to mean that S.A. controlled every aspect of hauling. Not only did Mr. Tompkins explain that S.A. never dictated the routes for drivers, and that a specific route was never a condition for hauling, but he stated later in his deposition that he would have no ability to enforce such a hypothetical command. Tompkins Dep. 44:11–15. *Contra Kresse,* 765 F.2d at 755 (finding ability to fire driver who deviated from specific route an indicia of control).

The plaintiff then argues in the alternative that the Court should not consider control over the route to be a factor because S.A. did not dictate the route for any haulers, including its own employees who hauled materials. It is incongruous to find this factor neutral simply because S.A. never controlled a driver's route. Rather, this fact demonstrates that S.A. never exerted control over a route, including that taken by Mr. Stalker.

### C. *The "Borrowed Servant Doctrine"*

■ The plaintiff argues that Mr. Stalker, and therefore Stafursky Paving,

are insureds under the Travelers policy not only under the terms of the policy itself, but also under the "borrowed servant doctrine." This doctrine provides that "one who is in the general employ of one employer may be transferred to the service of another in such a manner that the employee becomes an employee of the second employer." *Virtue v. Square D Co.,* 887 F.Supp. 98, 100–01 (M.D.Pa.1995). The plaintiff argues that Mr. Stalker was an employee of S.A. under the borrowed servant doctrine, making him and Stafursky Paving insureds.

The borrowed servant doctrine applies when an employee passes under the control from one employer to another. *Wilkinson v. K–Mart,* 412 Pa.Super. 434, 603 A.2d 659, 661 (1992). The determination is based on the right to control the employee, and not on the actual control exerted. *Id.* at 661. Relevant factors in the hauling context include whether the alleged employer had the right to dispatch and direct the driver, select routes, and direct day-to-day operations of the vehicle, and whether it owned the vehicle at issue. *See id.*

The plaintiff's arguments with respect to the borrowed servant doctrine replicate those from its "hired auto" analysis. Pl.'s Opp. 19 n. 5 & 23–24; Pl.'s M. 29–30. For the reasons stated in the previous section, the Court finds that S.A. did not have sufficient control over Mr. Stalker to make him a "borrowed servant." [9]

### D. *"Other Insurance"*

The Court does not reach the defendant's argument that the "other insurance" clause within the Travelers policy bars collection and indemnification. Because it finds that Mr. Stalker and Stafursky Paving are not insureds under the Travelers policy, the "other insurance" issue is moot.

### III. *Conclusion*

For the reasons herein stated, the Court grants summary judgment for the defendant. There is no genuine issue of material fact as to whether Mr. Stalker and Stafursky Paving are insureds under the Travelers policy. An appropriate order shall issue separately.

### ORDER

AND NOW, this 8th day of July, 2010, upon consideration of the parties' cross-motions for summary judgment (Docket Nos. 21 & 23), the parties' opposition briefs, and their briefs in reply thereto, the plaintiff's motion for leave to file a surreply (Docket No. 33), oral argument on the parties' motions, supplemental briefing by the parties, and for the reasons stated in a memorandum of law bearing today's date, IT IS HEREBY ORDERED that:

1. The defendant's motion for summary judgment (Docket No. 23) is GRANTED.

2. The plaintiff's motion for summary judgment (Docket No. 21) is DENIED.

3. The plaintiff's motion for leave to file a surreply (Docket No. 33) is DENIED AS MOOT.

4. Judgement is hereby entered for the defendant and against the plaintiff. This case is CLOSED.

---

**9.** The Court acknowledges that consideration of which employer actually hired the employee and paid the employee's wages are not relevant under the borrowed servant doctrine.

*Wilkinson,* 603 A.2d at 661. Putting such considerations aside, the Court still finds that S.A. did not have the requisite control to render Mr. Stalker a borrowed servant.